**Ex parte Danielle SIMPSON, Applicant.**

**No. 57060–01.**

Court of Criminal Appeals of Texas.

June 30, 2004.

---

James Volberding, Palestine & Thad W. Davidson, Tyler, for Appellant.

Doug Lowe, DA, Palestine, Matthew Paul, State's Atty., Austin, for State.

1. TEX.CODE CRIM. PROC. art. 11.071.

## ORDER

COCHRAN, J., delivered the order for a unanimous court.

Applicant presents thirty-seven allegations, including a claim of mental retardation, in his original application for habeas corpus relief in this death-penalty capital-murder case. The trial judge entered findings of fact and conclusions of law and recommended that relief be denied. We have reviewed the record, and we adopt the trial judge's findings and conclusions. Therefore, we deny relief. We also dismiss applicant's "Motion to Consider Additional Evidence of Mental Retardation" because that supplemental material was improperly and untimely filed with this Court instead of the convicting court. Article 11.071[1] does not authorize piecemeal submission of evidence, nor does it permit the original filing of evidence with this Court rather than the convicting court. Because the trial judge's written findings were so thorough and complete, we need discuss only applicant's mental-retardation claim and the motions applicant filed directly in this Court.

### I.

Applicant was indicted for the robbery and murder of Geraldine Davidson on January 26, 2000. In November 2002, a jury convicted him of that capital murder and, based upon the jury's answers to the punishment special issues, the trial judge sentenced applicant to death.

The evidence at trial showed that the 20–year–old applicant, a member of the Southside Cryps gang, planned and executed a burglary at the Palestine, Texas, home of Mrs. Davidson, an 84–year–old widow and retired teacher. He had burglarized Mrs. Davidson's home before, but this time he enlisted the aid of his sixteen-

year-old wife and thirteen-year-old cousin. Mrs. Davidson returned home during the burglary, so applicant and his cohorts tied her up with duct tape, put her into the trunk of her car, and then spent the afternoon driving around in her car buying and smoking formaldehyde-laced marijuana cigars. Later, they picked up applicant's younger brother and stopped at a Jack-in-the-Box, where applicant sent the others inside to buy food while he waited, outside surveillance camera range, in Mrs. Davidson's car. After the foursome ate and smoked more marijuana, applicant drove the car to the Neches River. He and his younger brother pulled Mrs. Davidson out of the trunk, tied her legs to a cinder block, beat her with her gardening shovel, kicked her in the head, and finally threw her in the river to drown. After dropping off his three cohorts, applicant "rented" Mrs. Davidson's car to friends in return for two rocks of crack cocaine. His friends were later pulled over in Mrs. Davidson's car, and they told the police about applicant "renting" them the stolen car. Police came to applicant's house to arrest him but he fled. The officers arrested applicant later that day, after he and his brother were found hiding in a neighborhood "dope house." Applicant was wearing Mrs. Davidson's gold wedding ring when he was booked into jail.

We affirmed applicant's conviction and sentence on direct appeal.[2] Meanwhile, on December 3, 2002, applicant filed his original writ of habeas corpus with the presiding judge of the convicting court.[3] Accompanying his writ application were two volumes of material, including various affidavits, treatise excerpts in support of his mental-retardation claim, documents from the underlying trial, and published law review and behavioral science articles. The State filed its response five months later. On June 23, 2003, after consulting with the attorneys, the trial judge entered an order that found that there were no factual issues that could not be resolved by using the trial record and the written writ materials. Thus he decided that a live evidentiary hearing was unnecessary. He ordered both the State and applicant to file proposed findings of fact and conclusions of law. On July 14, 2003, applicant filed an additional affidavit by Dr. Windel Dickerson who, based on a personal examination of applicant and his review of various other materials, concluded that applicant was mildly mentally retarded. Two weeks later the trial judge signed an order permitting both the State and applicant to acquire and file additional educational records for applicant. On that same day, the trial judge denied applicant's proposed findings of fact and conclusions of law and signed the State's proposed findings.

On August 7, 2003, applicant's special-education records were filed with the convicting court, and, one month later, applicant filed a videotaped statement made by Dr. Dickerson.[4] All of these materials

---

2. *Simpson v. State,* 119 S.W.3d 262 (Tex. Crim.App.2003).

3. In his writ application, applicant candidly admits that his claims 20–37 are ones that have been previously rejected by this Court and "are therefore segregated at the end of the application and need not delay the Court." Nonetheless, we have carefully reviewed those claims, as well as all of his other non-mental retardation claims, and deny

them based upon the trial court's findings of fact and conclusions of law.

4. Applicant submitted these materials to the trial court *after* that court had filed its findings of fact and conclusions of law and thus they are not discussed within the trial court's written findings. Nonetheless, we have independently reviewed the materials and conclude that they do not present any significant additional information that was not already

were then forwarded to this Court on September 10, 2003. Applicant has continued to file additional motions in this Court, culminating, on May 19, 2004, with a "Motion to Consider Additional Evidence of Mental Retardation." Attached to this motion is a letter from Dr. Dickerson and an accompanying psychological-services test report, again setting out his opinion that applicant is mentally retarded.

## II.

■■■ Applicant contends that he is mentally retarded and thus, under *Atkins v. Virginia*,[5] he is exempt from execution. Here, as in *Hall v. State*, [6] the convicting court did not hold a live evidentiary hearing on applicant's post-conviction habeas corpus allegation of mental retardation. But, also as in *Hall*, the issue of mental retardation was fully litigated during the punishment phase of applicant's original capital-murder trial. Although applicant's trial took place before the Supreme Court

decided *Atkins*, his able trial counsel presciently predicted the outcome of that case and presented extensive mental-retardation evidence as calling for a "Yes" answer to the mitigation special issue submitted to the jury. Applicant's habeas writ relies almost exclusively upon that extensive testimony. Although it is advisable to have an evidentiary hearing to determine mental-retardation claims raised for the first time in post-*Atkins* habeas applications,[7] it is not necessary where, as here, the habeas applicant relies primarily upon trial testimony. In this case, both sides had an opportunity to fully develop the pertinent facts at trial, and the habeas judge had an opportunity to assess the credibility and demeanor of the witnesses when he presided over the trial. Although the discrete fact of mental retardation was not an ultimate issue at the capital-murder trial, the punishment phase testimony fully developed that contested fact.[8]

---

before the trial court at the time he made his findings.

5. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

6. —— S.W.3d ——, ——, 2004 WL 948342, 2004 Tex.Crim.App. LEXIS 817 (Tex.Crim. App.2004).

7. *See Hall*, —— S.W.3d at —— (Price, J., concurring) (noting that "generally, for the review of a contested *Atkins v. Virginia* claim, the trial court will need to hold a live hearing and not base its decision solely on affidavits submitted by the parties"); *id.* at ——, (Johnson, J., dissenting) (noting that "[n]o trier of fact in this case has ever heard live testimony, subject to testing or cross-examination, on the specific issue of whether appellant is mentally retarded"); and *id.* at —— (Holcomb, J., dissenting) (noting that capital murder defendant "was not provided with a live evidentiary hearing ... [and] was not able to cross examine the affiants and the judge was not able to evaluate their credibility").

8. *See Hall*, —— S.W.3d at ——. In *Hall*, as in the present case, mental retardation was not

an ultimate discrete fact litigated during the capital-murder punishment phase. We noted that:

> the parties introduced a significant amount of evidence regarding whether appellant was mentally retarded, mental retardation was not considered as a discrete issue by the trial judge or the jury. Although the parties certainly had incentive to litigate the question of appellant's intelligence, the litigation occurred as a question of degree: defense counsel could contend that appellant's low intelligence mitigated his moral culpability even if it did not amount to mental retardation, while the State could contend that, even if appellant were in the mental retardation range, he appreciated the consequences of his actions to a sufficient degree to deserve the death penalty. Had mental retardation been an ultimate issue, the parties may well have litigated the issue even more robustly than they did, as the issue would be a question of kind (which side of the mental divide appellant was on) rather than degree (how much did appellant appreciate the immorality of his conduct).

■ During the punishment phase of applicant's trial, the defense called applicant's father, mother, and two sisters. Significantly, none of these witnesses—the persons who knew him best during his youth—testified that they had thought, during his formative years, that applicant was mentally retarded.[9] Applicant's father remembered that applicant had twice suffered head injuries as a child, but he did not know whether he suffered any brain injury as a result. He testified that applicant had had school truancy problems and usually got into trouble alone. While applicant's father stated that applicant had a history of seizures, his sister said that she did not believe that applicant had ever suffered seizures. Applicant's elder sister, a TDCJ–CID prison guard, said that there was very little good that she could say about him other than the fact that he attended church. Applicant's mother testified that applicant failed kindergarten and third grade, that he was sometimes placed in special-education classes, and that he was "very slow and had a learning disability." He missed a lot of school because he had headaches, felt bad about himself, and because she could not drive him to school all the time, as she had to work two jobs. She made him move out of her home about a year before the murder because he had sexually assaulted her adopted daughter.

The defense also called a psychologist, a pediatric neurologist, and a psychiatrist to testify to applicant's mental condition and abilities. Dr. Andrews, the psychologist, testified that applicant has borderline intellectual functioning. He stated that applicant's academic knowledge is "low" and that he reads at an early high-school level, and has a fifth-grade spelling ability and sixth-grade math ability. When applicant was 14 years old, his full-scale IQ score on the Wechsler Intelligence Scale for Children was 71, and he scored a 72 on the TONI.[10] The next year he received a 78 full-scale IQ score on the Wechsler and an 86 on the TONI–2. No one discussed the significance of this improvement in IQ scores.

Applicant dropped out of school in the ninth grade. His teachers consistently noted his high truancy rate as an educational impediment. Dr. Andrews stated that applicant has adaptive deficits and a low ability to complete planning and organization tests. He did not believe that applicant was faking mental deficiencies, but he did think that applicant is "a chronic liar" and that his manipulative conduct in jail demonstrated adaptive behavior.[11]

---

*Id.* Nonetheless, during this writ proceeding, both parties could, and did, present whatever additional evidence they believed supported or negated the fact of mental retardation. It was only after consulting with the attorneys that the trial judge determined that a live evidentiary hearing was not necessary.

9. LaTonya, one of applicant's sisters, did testify that applicant was twice held back in elementary school and "had a bunch of problems." She testified that he missed a lot of school: "I'm not saying he was retarded, but I'm just saying that he was slow." Applicant's other sister, Tangela, testified that applicant was slow "as far as educational level," but not in other things.

10. Test of Non–Verbal Intelligence.

11. Dr. Andrews agreed that applicant's conduct in writing his mother-in-law from jail saying that he would serve his time for this capital murder in a mental hospital by telling "my lawyer and the judge that I need some help and I'm having problems and seeing things and hearing things" was goal-directed and showed a knowledge of the legal system and how to avoid the death penalty. Dr. Andrews stated that he did not believe applicant when applicant told him he had auditory and visual hallucinations. Applicant also told Dr. Andrews that he had been hospitalized for psychiatric problems, but Dr. Andrews could not find corroboration for this assertion.

Dr. Andrews concluded that applicant is in the "borderline mentally retarded range" and would not resolve complex situations very well.[12] Dr. Andrews also stated that applicant has an anti-social personality.

Dr. Wise, a pediatric neurologist, reviewed applicant's EEG (electroencephalogram) and testified that applicant has an abnormal neurological status, a generalized slowing of brain function. He stated that the brain changes as a person ages and is influenced by such things as diet, smoking, drug use, and trauma. He had not personally examined applicant.

Dr. Barry Mills, the chief psychiatrist for the Maximum Security Behavior Management Program at Vernon State Hospital, examined applicant and concluded that applicant has two subdural hematomas (blood clots on both sides of his brain) which have caused brain damage. As a result, applicant has poor judgment, an inability to learn from his mistakes or to change his actions in response to complicated situations, and an inability to control frustration or manage himself. Dr. Mills acknowledged that there is nothing in applicant's medical records to confirm any head injury. He did agree that smoking embalming fluid may cause EEG changes. Dr. Mills stated that applicant was not malingering during his examination but that he had been "manipulative and dishonest throughout a large part of his life." He testified that "I did not say [applicant] was mentally retarded. I said he was borderline mentally retarded, essentially functioning at that level, but his I.Q. score was not mentally retarded." He agreed that applicant had never been diagnosed by anyone as "borderline mentally retarded" until after he was charged with capital murder, and he stated that applicant's TONI IQ of 86 was "a more accurate measure of [applicant's] intelligence."

In rebuttal, the State called Dr. David Self, a psychiatrist, who had also examined applicant. In his opinion, applicant was malingering and faking his psychiatric symptoms. He stated that, during his interview, applicant spontaneously launched into a narrative of various mental complaints, including visual and auditory hallucinations, depression, an attempted suicide, and a history of head trauma. In Dr. Self's opinion, applicant's intellectual functioning is in the borderline-to-low average range and he does not have significant adaptive deficits. Dr. Self described applicant's letter-writing campaign from jail to various friends and relatives asking them to smuggle contraband to him as adaptive, albeit anti-social, behavior. In his opinion applicant's lack of empathy, his callous disregard for others, and his prior conduct, including his sexual assault of his adopted sister, his shooting at his ex-girlfriend, and his assaults on his wife and children, were traits consistent with a psychopathy. Dr. Self stated that applicant's MRI showed evidence of a prior "head trauma," but no evidence of any brain damage. He concluded that applicant has an anti-social personality disorder, but is not mentally retarded.

Additional evidence was timely submitted for the convicting court's consideration on the writ. This evidence included most of applicant's school records, his two writ-

---

12. Concerning the issue of "significant adaptive deficits," Dr. Andrews explained:

Well, he was not able to function well in school. He was not able to function well in a work setting. These could be adaptive deficits. They might be problems with personality as well. I am not terming him mentally retarded but I do think he has some adaptive deficits.

He noted that applicant had been diagnosed with a learning disability, not mental retardation, by school officials based upon his IQ test of 78 and TONI results of 86.

ten statements to police after his arrest for this murder, twenty inmate-request forms that applicant submitted while he was in jail awaiting trial, letters that he wrote to family and friends from jail, a letter that he had written from jail to a venireperson whose name and address he had memorized in the courtroom from his attorney's jury list, and applicant's medical and mental-health records from TDCJ–CID.

Applicant's school records showed that, in almost every year, he missed a large number of school days, but nonetheless he achieved passing grades in almost all classes. Seventeen "Notices of Concern" were sent to his family during one school year; they noted that applicant failed to complete assignments, failed to make up missed tests, and that he exhibited "excessive absences" and "lack of effort."

Applicant's jail letters are clear, coherent, and clever. In one, he explains to his cousin how to smuggle photographs of his three girlfriends into the jail by taping them to extra pages in an incoming letter. In letters to his brother, applicant writes jocularly in gang slang. In letters to his mother, on the other hand, applicant writes in standard English, without slang. He uses a polite tone as he instructs her on how to smuggle tobacco and rolling papers into the jail by putting them in envelopes labeled "Legal Mail," and having them delivered by his defense investigator. He tells his mother that he is working on getting joint custody of his son for her and his wife's mother, and asks her to call the defense investigator and have him bring applicant a small tape recorder so he can record his wife's custody concessions on the phone.

Applicant's TDCJ–CID medical and mental-health records show that applicant achieved an IQ result of 84 on a TONI test when he arrived on death row which, according to the records, "precluded other need for I.Q. testing."

The trial judge entered findings of fact, based on his review of the trial and writ evidence, that applicant failed to present a cognizable claim of mental retardation because he failed to show facts that prove he is mentally retarded. The trial judge found that Dr. Dickerson's affidavit concluding that applicant is mentally retarded was untimely submitted and therefore should not be considered. In the alternative, he found it unpersuasive.[13]

Although the trial court did not have the benefit of this Court's opinion in *Ex parte Briseno*,[14] it followed the methodology and legal standards set out in that opinion. Applicant claims that his execution would violate the Supreme Court's rulings in *Atkins* and *Ring v. Arizona*[15] unless a jury

13. Specifically, he found that the prison testing conditions "likely affected" the test scores; the IQ score of 59 that Dr. Dickerson reached was completely at odds with all prior test scores; only portions of tests were given; separate tests for malingering were not given; Dr. Dickerson's assertion that applicant was treated as a mentally retarded person in school was contrary to all other evidence which indicated applicant had a learning disability and truancy problem; Dr. Dickerson appeared not to have reviewed all of the trial testimony; his "adaptive behavior" assessment did not describe behavior that is necessarily the result of mental retardation; Dr. Dickerson's assessment was based largely

upon applicant's self-reporting, but applicant's veracity to mental-health experts had been called into serious question by other experts. Dr. Dickerson's videotaped interview, which was submitted to the trial court after the written findings were signed, does not differ substantively from his affidavit.

14. *Ex parte Briseno*, 135 S.W.3d 1 (Tex.Crim. App.2004).

15. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that "if a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that

has found, beyond a reasonable doubt, that he is *not* mentally retarded, brain damaged, or otherwise lacking in mental culpability. This is a claim that we rejected in *Briseno,*[16] and it is a claim that the habeas judge in this case rejected as well.

In sum, although there was some evidence in the trial and writ record suggesting the possibility of mild mental retardation, there was also ample evidence in the record supporting the trial court's finding that applicant is not mentally retarded. We conclude that the trial court did not abuse its discretion in reaching this factual conclusion. Therefore, we deny applicant relief on his mental retardation claim.

### III.

■ We also dismiss applicant's recently filed "Motion to Consider Additional Evidence of Mental Retardation" because we do not have statutory authority to consider additional evidence.

Applicant's writ application, the State's response, all associated exhibits, and the trial court's written findings of fact and conclusions of law were received by this Court on September 10, 2003. Article 11.071, § 9(f) explicitly states that once all of the appropriate materials have been timely submitted to the trial court and the trial court has made its written findings of fact and conclusions of law, the clerk of the convicting court shall immediately transmit these materials to this Court. Then, under article 11.071, § 11, this Court shall

"expeditiously review" the habeas application. We may (but need not) set the case for oral argument and we may (but need not) request further briefing.[17] "After reviewing the record" as it was developed in the trial court, this Court "shall enter its judgment remanding the applicant to custody or ordering the applicant's release, as the law and facts may justify."[18]

In the present case, applicant asks us to act outside of our statutory authority. On November 24, 2003, more than a month after the clerk of the trial court transmitted all of the appropriate writ materials to this Court, applicant filed a motion with this Court entitled "Motion to Declare Simpson Mentally Retarded under *Atkins* or Alternatively, Motion to Remand for Evidentiary Hearing to Determine Mental Retardation." This motion alleged that applicant's counsel was "trying to set up an appointment with Dr. Dickerson to re-examine Mr. Simpson."[19] He requested that this Court stay further action until Dr. Dickerson could file a new report directly with this Court.

On February 9, 2004, this Court received applicant's "Supplemental Reply to State's Response to Petitioner's Mental Retardation Summary." This document stated that Dr. Dickerson had completed his second examination of applicant and a preliminary report was attached. Although the document was filed with this Court, applicant asked that the habeas

fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt").

16. *Ex parte Briseno,* 135 S.W.3d at 10 (concluding that *Ring* is inapplicable to claims of mental retardation because "[a] lack of mental retardation is not an implied element of the crime of capital murder which the State is required to prove before it may impose a sentence above the maximum statutory punishment for that crime").

17. Tex.Code Crim. Proc. art. 11.071, § 11.

18. *Id.*

19. Ostensibly, applicant's counsel wanted this re-examination because the trial judge discounted Dr. Dickerson's first untimely filed affidavit for the various reasons set out earlier.

judge read the attached preliminary report and make supplemental findings. We do not know whether the habeas judge received and read this document, but he did not file any supplemental findings, presumably because he did not have statutory authority to do so.

Finally, on May 19, 2004, applicant filed his Motion to Consider Additional Evidence of Mental Retardation. He states that this motion is a supplement to the motion he filed with this Court on November 24, 2003. According to that motion and Dr. Dickerson's attached report, the results of this second mental-status test were obtained under better conditions than those under which earlier tests were taken. Dr. Dickerson again opines that applicant is mildly mentally retarded and suffers from organic brain damage.

There is no provision in article 11.071 that permits either the State or the habeas applicant to submit original evidence directly to this Court. Evidentiary affidavits, letters, transcripts, or other documents relating to a habeas claim should not be attached to motions or briefs, and they shall not, and will not, be considered by this Court. As we recently stated in another context:

> An appellate court may not consider factual assertions that are outside the record, and a party cannot circumvent this prohibition by submitting an affidavit for the first time on appeal. While the record may be supplemented under the appellate rules if something has been omitted, the supplementation rules cannot be used to create new evidence. Moreover, an appellate court's review of the record itself is generally limited to the evidence before the trial court at the time of the trial court's ruling.[20]

In the ordinary case, if this Court were to consider evidentiary materials that were never submitted to, or considered by, the habeas court, the statutory purpose in having the convicting court gather the pertinent evidence and make the appropriate written findings of fact would be entirely frustrated.[21] The legislative framework of article 11.071 contemplates that the habeas judge is "Johnny–on–the–Spot." He is the collector of the evidence, the organizer of the materials, the decisionmaker as to what live testimony may be necessary, the factfinder who resolves disputed factual issues, the judge who applies the law to the facts, enters specific findings of fact and conclusions of law, and may make a specific recommendation to grant or deny relief. This Court then has the statutory duty to *review* the trial court's factual findings and legal conclusions to ensure that they are supported by the record and are in accordance with the law.[22] We are

---

**20.** *Whitehead v. State,* 130 S.W.3d 866, 872 (Tex.Crim.App.2004). *Cf. Ex parte Harris,* 825 S.W.2d 120 (Tex.Crim.App.1991) (noting that *Penry* claims are limited to evidence contained in the record. "Evidence outside of the record is wholly irrelevant to such claim"); and *Pye v. State,* 71 Tex.Crim. 94, 101, 154 S.W. 222, 226 (1913) ("Should we consider these ex parte affidavits it would be necessary that we have the State served with a copy of them, and permit it to introduce evidence in rebuttal thereof; in fact, reopen the case and convert this court into a trial court on the merits of the case, and then substitute our finding on the facts as thus presented to us for that of the verdict of the jury. This we are not authorized to do. If such was the rule, very nearly every case that was appealed to this court would have to be tried de novo. This would be wholly impracticable, and it was never contemplated that this court should become a trial court").

**21.** *See Pye,* 71 Tex.Crim. at 101, 154 S.W. at 226.

**22.** *See Hall,* —— S.W.3d at —— (stating, in context of mental retardation claim raised in habeas application, that "we afford almost total deference to the trial judge's findings of fact, especially when those findings of fact are based upon credibility and demeanor").

not the convicting trial court, and we are not the original factfinders. It is generally fruitless, if not counterproductive, to file original evidentiary materials relating to a habeas claim with this Court rather than the trial court. Although we might have the implicit authority to consider evidentiary materials filed directly with this Court, normally the jurisprudential considerations of efficiency, effectiveness, and comity to the habeas court counsel against such consideration. Because applicant has failed to offer proof of any compelling and extraordinary circumstances, we decline to consider the evidentiary materials that he has filed directly with this Court.

Therefore, based upon our review and our adoption of the trial court's ninety-five pages of thorough and comprehensive findings of fact and conclusions of law which were submitted to this Court, we deny relief and dismiss applicant's motions filed directly in this Court.