**Ex parte Brandy Del BRIGGS, Applicant.**

**No. AP–75199.**

Court of Criminal Appeals of Texas.

Dec. 16, 2005.

---

Charles H. Portz, Houston, for Appellant.

Charles A. Rosenthal, Jr., Houston, for the State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and HOLCOMB, JJ., joined.

We withdraw the original opinion delivered on December 14, 2005, and substitute this corrected opinion.

Applicant's baby boy, Daniel Lemons, was very sick from the time he was born. Applicant repeatedly took him to doctors, but they did not diagnose the underlying cause of his ailments. He died at the age of two months at Texas Children's Hospital after having been admitted several days earlier with a diagnosis of hypoxia (lack of oxygen to the brain), which was aggravated by emergency-room personnel who mistakenly inserted an endotracheal (oxygen) tube into his stomach instead of his lungs. The original 1999 autopsy report stated that Daniel's death was the result of homicide, but in 2003, the Harris County Chief Medical Examiner amended that report and concluded that Daniel's death was the result of "undetermined" causes.

Meanwhile, applicant had pled guilty to injury to a child for causing Daniel's death and been sentenced to seventeen years in prison. In 2004, she filed a petition for a writ of habeas corpus claiming that: (1) she was actually innocent of the offense; (2) her attorney provided ineffective assistance of counsel; and (3) the prosecution failed to adequately investigate this case.[1]

---

1. We need not address this third claim which deals with the State's failure to fully investigate Daniel's medical records as that issue is

We grant relief, finding that applicant's attorney failed to adequately investigate this case under the standards set out in *Strickland v. Washington*[2] and *Wiggins v. Smith*.[3]

## I.

Daniel Lemons was born to seventeen-year-old Brandy Del Briggs and her husband, David Lemons, on March 3, 1999. According to Dr. Luis Sanchez, the Harris County Chief Medical Examiner, who testified at the 2004 writ hearing, Daniel "was pretty sick from the beginning of his life." He was born with a congenital defect. When he was one week old, he developed a serious urinary infection because his "defective" left ureter caused his urine to back up into the kidney. Daniel became "septic."

On March 10, 1999, applicant took him to the hospital where he was diagnosed with a "raging urinary infection." No x-rays were taken and no kidney studies were conducted during what turned into a ten-day hospitalization.[4] Daniel was then involved in an automobile accident and may have been injured because his car seat faced forward instead of backward.[5] By then, Daniel also suffered from breathing problems, especially when applicant changed his diaper, hugged or held him— all times in which Daniel's abdominal organs were brought toward his chest or compressed. Applicant took Daniel back to the hospital again because he was suffering from shortness of breath and constant choking,[6] but he was sent home after having been diagnosed with "nasal congestion." Because the signs were "subtle and sometimes not very clear," the underlying cause of Daniel's fussiness and his birth defect were undiagnosed. Applicant took Daniel to doctors and hospitals five different times before he was two months old.

According to the medical records, applicant called 911 around noon on May 2, 1999, after she checked on Daniel during his nap and found that he was blue and limp, though he still had a pulse. She began mouth-to-mouth resuscitation. When EMS personnel arrived, they intubated Daniel and transported him to LBJ Hospital. The admitting diagnosis there was hypoxia (lack of oxygen to the brain) of unknown origin. Upon admission, emergency room personnel reintubated Daniel. In doing so, they accidentally placed the tube into his esophagus instead of his trachea, and they did not discover their error until x-rays were taken approximately thirty minutes later. By that time, Daniel was cyanotic because his brain had received "insufficient" or no oxygen during that thirty-minute period. According to Dr. Sanchez, "[t]hat made the entire brain to become dead." Daniel was later transferred to Ben Taub Hospital and then to Texas Children's Hospital

addressed under applicant's ineffective assistance of counsel claim.

2. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

3. 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

4. The medical records from Daniels's ten-day stay at the Texas Children's Hospital, from March 10–19, 1999, are included in the writ record.

5. The autopsy report indicated that Daniel had a healing *anterior* rib fracture. According to Dr. Sanchez and other medical experts who submitted reports and affidavits for the writ hearing, *posterior* rib fractures are common signs of child abuse and result from a person's squeezing a child's chest.

6. The Texas Children's Hospital medical records of April 7, 1999, are included in the writ record.

where he died seven days later, on May 9, 1999.[7]

According to Dr. Sanchez's testimony at the writ hearing, Daniel had suffered no blunt trauma, and he had no signs of child abuse or of shaken baby syndrome. The original pathologist report stated that Daniel had bruising on his left cheek and eyelid,[8] but Dr. Sanchez explained that this was likely caused by surgical tape attached to his nasal tubes and was apparent in the pictures taken of Daniel while he was in the hospital.

Dr. Matthias I. Okoye, the Director of the Nebraska Forensic Medical Services, and Dr. Jan E. Leestma, a partner in the Chicago Institute of Neurosurgery and Neuroresearch Medical Group, submitted affidavits in the writ case. They not only concurred with Dr. Sanchez's opinion that there is no medical evidence of Daniel having suffered from child abuse, but they each formed the opinion that Daniel

died of multiorgan/system failure resulting from sepsis which was complicated by disseminated intravascular coagulation, multiple bleeding diathesis and bilateral acute bronchopneumonia and hypoxic encephalopathy with associated multiple brain infarcts.

In plain English, they think that Daniel died from an undiagnosed birth defect which led to a raging urinary infection, then to sepsis and severe pneumonia, made worse by the faulty intubation which led to brain death.

Dr. James D. Dibdin, a practicing forensic pathologist for over twenty years, also submitted an affidavit in which she

concluded to a high degree of medical certainty that Daniel Lemons died of natural causes, and that the cause of his death was complications of septicemia which probably had its origins in a chronic urinary tract infection. These complications included septic shock and disseminated intravascular coagulation which produced conditions which sim-

---

7. The admitting diagnosis at Texas Children's Hospital on May 2, 1999, noted that Daniel had been given an excessive amount of IV fluids at Ben Taub, and that he was in septic shock with acute respiratory failure, followed by multiple organ failure. According to one consulting doctor at Texas Children's, Daniel had suffered a lack of oxygen to the brain because of the faulty intubation that had caused anoxic ischemic injury to the brain. Daniel's prognosis was "extremely poor" due to an increase in intracranial pressure.

8. A Texas Children's Hospital report by Dr. David Coats on May 3, 1999, noted that Daniel had "severe, intraretinal hemorrhages. This is also bruising about the nose.... In this setting, non accidental trauma (i.e. shaking injury) should be strongly considered."

The LBJ Hospital records do not indicate that Daniel had retinal hemorrhaging when he arrived there. It was only after the faulty intubation and transfer to Texas Children's Hospital that the intraretinal hemorrhaging appeared. And it was only after Daniel's

transfer to Texas Children's that the medical records reflected bruising around his nose.

According to one of the medical articles included in the writ record, *Patterns of Presentation of the Shaken Baby Syndrome—Subdural and Retinal Hemorrhages Are Not Necessarily Signs of Abuse*, LeFanu J., Edwards-Brown, R., BMJ 2004:328:767–769, these physical signs, though frequently accompanying a "shaken baby," may result from entirely unrelated causes as well, such as sepsis and disseminated intravascular coagulation. According to another treatise referenced in the writ record,

Not all causes of retinal hemorrhage are due to trauma. Retinal hemorrhage may be found in cases of subacute bacterial endocarditis ... [and] disseminated intravascular coagulopathy ...

SPITZ, WERNER, RUSSELL, MEDICOLEGAL INVESTIGATION OF DEATH 710 (3d ed.1993).

Although Dr. Coats focused upon Daniel's "severe brain injury" as an indication of possible child abuse, he did not mention the faulty intubation at LBJ which had led to Daniel's brain death.

ulated and were mistaken for physical injuries.

After Daniel's death, the case was referred to the Harris County Sheriff's Office for criminal investigation. Based upon the original autopsy report which had concluded that Daniel's death was the result of "homicide,"[9] and an extensive law enforcement investigation, including applicant's own grand jury testimony and a failed polygraph examination, applicant was charged with first-degree injury to a child on June 9, 1999.

She retained counsel and paid him $10,400 of his $15,000 fee. On May 18, 2000, he wrote applicant a letter stating that he "will probably present the Court a Motion to Withdraw when we appear on May 24, 2000," because applicant had not paid the remainder of his fee. He also stated that he could not hire experts unless he was paid additional money for their expenses and for coming to court. He estimated this additional fee for experts as being between $2,500 and $7,500. Applicant's attorney did not withdraw and the case was set for trial, but, on October 2, 2000, applicant pled guilty without a recommendation from the State. The case was reset for preparation of a Presentence Investigation Report.[10] After a sentencing hearing on December 8, 2000, the trial judge sentenced applicant to seventeen years' imprisonment. Applicant filed a motion for new trial on January 8, 2001, which was overruled by operation of law, and her conviction was affirmed on appeal.[11]

9. The pathologist who performed the original autopsy on Daniel submitted an affidavit in the writ case reaffirming her initial opinion that Daniel's death was a homicide, but she also stated that "I feel that another opinion from an outside source would be of utmost importance.... [S]omeone with more experience (performed several autopsies on pediatric cases for years) and more expertise (in neuropathology and/or pediatric pathology or pediatrics) than I could help resolve the issues involved in this case."

The pathologist acknowledged that Daniel's medical history and the medical records setting out his prior hospitalizations show that he had a urinary tract infection, prior history of breathing problems and nasal congestion, and a documentation of the prior faulty intubation which contributed to "some of the findings of hypoxic/ischemic enephalopathy of the brain, but the child was noted to be cyanotic, with unreactive pupils, with labored breathing (respiratory distress) and absent breath sounds when the paramedics arrived at the scene at 13:22 on 05/02/99." The EMS records also show that after the paramedics intubated Daniel and began "bagging" him, his breathing and color improved during the drive to LBJ.

The original pathologist is no longer with the Medical Examiner's Office. Applicant introduced numerous official Harris County Medical Examiner's Office "conduct counsel-

ing" reports in the writ hearing concerning the purported deficient performance in various cases by the original pathologist. We express no opinion on the relevance or admissibility of such materials.

10. The PSI indicated that applicant was an eighth-grade drop-out who worked at the Crosby Olde Time Café and earned $1,500.00 a month plus tips. She had monthly expenses of $1,062.00, a personal loan of $3,000.00, and a credit card balance of $600.00. She reported that she still owed her trial attorney $10,000.00.

According to an affidavit filed by applicant's mother in the writ case, she paid all of her savings to applicant's trial attorney; as a result she lost a small restaurant and her car was repossessed. Applicant's husband filed an affidavit stating that he drives a truck to pick up scrap tires, has no money in the bank or assets to sell. He lives in an apartment. Applicant's father filed an affidavit stating that he lives from paycheck to paycheck and makes mortgage payments on his home and car payments. He has no assets available to sell.

11. *Briggs v. State*, No. 01–01–00248–CR, 2002 WL 287530, 2002 Tex.App. LEXIS 1562 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (not designated for publication). The only issue

## II.

■ Applicant's first habeas claim is that she is actually innocent of the crime charged because no crime ever occurred. Daniel died of natural causes. Although there is considerable evidence that supports applicant's position, there is nonetheless evidence in the record that would support a finding that Daniel did not die of natural causes and that applicant caused his death. We cannot ignore applicant's guilty plea in 2000 or her self-inculpatory, "consciousness of guilt" testimony at the sentencing hearing, although reasonable factfinders might reach different conclusions concerning that testimony.[12] The tri-

---

raised on direct appeal was the trial court's failure to conduct a hearing on applicant's motion for new trial.

12. It would not necessarily be surprising that a seventeen-year-old eighth-grade drop-out mother would feel responsible for her infant son's death, especially· if she was unaware of her child's birth defect (which was not diagnosed until 2003 by the Harris County Chief Medical Examiner) or of the faulty intubation at LBJ Hospital. There is no indication in the medical records that Daniel's parents were ever told of their son's mis-intubation.

The State also relies heavily upon applicant's testimony during the sentencing hearing to show that she had, in fact, "shaken" Daniel on May 2, 1999. A couple of days before that hearing, applicant's trial attorney called applicant and secretly tape-recorded his conversation with her. He expressed surprise and annoyance that the pre-sentence investigation report stated that applicant's CPS caseworker told the probation officer that applicant had "consistently denied that [she] did anything wrong and the only reason [she] pled guilty was because her lawyer forced [her] to do it." He also said, "The only other thing in there that's a real problem is throughout the whole ... PSI, you said you never did anything wrong to your child to cause any kind of injury[.]" He told applicant that "unless you are willing to sign a statement saying that's not true, the Judge is not going to have any way of knowing, she's going to believe what's in that statement and I just don't want to be, want to be caught in that position."

During the sentencing hearing, her attorney asked her:

Q: Now, you pled guilty to injury to a child. What did you do, Ms. Briggs, that caused the injury that lead to Daniel's death?

A: That morning I woke up to wake him up to feed him, when I got him out of his bed he was limp and his face was real blue. I brought him into the living room, sat him on the couch, he wasn't breathing. I panicked and I shook him hoping that he would breathe and I called my mother and then I called 911.
...

Q: Did you shake your baby, Brandy?

A: Yes.
...

Q: Do you understand that you don't shake little babies?

A: Yes, sir.

On cross-examination, the prosecutor followed up on this:

Q: Mrs. Briggs, how hard did you shake Daniel? If you can, you can pick up that box of tissues for the judge and show the judge with that box of tissues how hard you shook Daniel that morning.

A: Probably like that.

Q: How long did you shake him for?

A: I didn't think for very long.

Q: Why don't you demonstrate for the judge how long you shook him with that box of tissues.

A: Probably like that.

Q: For one or two seconds, that's all?

A: I don't—I don't remember.

Q: You don't remember. When you were—when you were shaking him, did he hit his head up against something, a wall, a table, or anything?

A: No, not that I remember.

Q: You don't remember, but you possibly could have hit his head up against something?

A: There was nothing around to hit his head.

Q: What were his head and neck doing when you were shaking?

A: It probably went back.

Q: Went back. Where were your hands when you were shaking?

A: Just on his side.

Q: On his ribs? On both sides of him?

A: Just like, right in here.

Q: So you had him up—you had him up like this and were shaking. And what was his head and neck doing?

al court found her writ assertions of innocence "not credible" and therefore we will not consider applicant's factual statements supporting her innocence.

In her findings, the trial judge repeatedly relied upon the fact that Daniel's prior medical records were available to applicant before she pled guilty:

The opinions of the experts hired by applicant are based on physical evidence and records that existed at the time of applicant's guilty plea.

Applicant was aware of the complainant's medical history and its significance before she pled guilty, as evidenced by her grand jury testimony about the complainant's several visits to doctor and hospital during his brief life.

[Applicant's trial attorney] was aware of the complaining witness's pre-existing medical condition and perused the medical records pertaining to that condition. Applicant and her attorney intended to make the complainant's pre-existing medical condition a central point of her defense but could not effectively do so without the assistance of an expert witness.

Indeed, the trial court is correct: Daniel's extensive medical records documenting his history of a birth defect, urinary tract infection, sepsis, and bronchopneumonia were available at the time this case was set for trial. These records are not, therefore, "newly discovered" or "newly available" evidence. They were always available had someone investigated their import.

We agree with the trial court that: (1) the medical evidence of Daniel's cause of death was always available; and (2) the expert opinions of Dr. Sanchez, the current Chief of the Harris County Medical Examiner's Office, and those of Drs. Okoye, Leestma and Dibdin, are not medically indisputable, and thus applicant's evidence submitted on the writ does not "unquestionably" establish her innocence under *Elizondo*.[13] Thus, we deny applicant relief on her "actual innocence" claim.

### III.

Applicant also claims that her attorney provided ineffective assistance of counsel. In her writ application, she contends that her trial attorney "did not investigate any medical reports on my son. He told me to plead guilty for probation. It was only after hiring [another attorney for the writ application] that the medical records were checked and showed that I did not hurt my baby."

■ Applicant's trial attorney submitted an affidavit in which he denied coercing her into pleading guilty because she could not pay him for experts. He stated, *inter alia,*

A: It went back.
Q: Back and forth?
A: It didn't go, but maybe one time and then I stopped.
Q: Had you ever shaken him like that before?
A: No, sir.
. . .
Q: So you're telling the Judge you knew that there was a danger because you had heard it that if you shake a baby, you could cause injuries and damage to him, am I correct?
A: Yes, sir.
Q: And you still did it, am I correct?
A: Yes, sir.

. . .
Q: And you don't remember if his head hit something?
A: Yes, sir.
. . .
Q: And you can agree with me that you didn't do a very good job with Daniel, am I correct?
A: Yes, sir.

13. *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex.Crim.App.1997) (defendant bears burden of showing that newly discovered evidence unquestionably establishes his innocence).

During the representation of Ms. Briggs, I secured all of the medical records for Daniel Lemons and presented them to Brandy and her family to review. They returned the records back to me and I placed the records in two 3–ring binders according to the person who examined Daniel, their findings, and what I thought the relevant statements were. I did that for every doctor that was mentioned in the records. I highlighted the areas that I felt would be a problem for our case and Brandy and her mother came to my office and we reviewed these records in detail specifically going over the parts that I highlighted.[14] I told Brandy that I had ordered documentation on a similar disease that she had brought to my attention as a result of what other people had told her. On the basis of the information I received, I advised Brandy that they needed to pay me to hire a medical expert to review the records and compare it to the findings set out in the brochures I had received. I was never paid anything for any medical expert, nor was I paid for the medical records that I had already secured.

This case was set for trial. At the time of trial, I reminded Brandy that we had no medical expert testimony to offset some of the problems that I had brought to her attention approximately 4–6 months earlier. The entire time, they told me that "they were working on getting some money" for an expert. I told them it could range from $2500–$7500, which I felt was reasonable to pay a medical expert to review the records and advise us of his position.[15] There was never any discussion that she had to pay me any specific amount of money for a specific medical expert OR that "she would go to prison" for that reason alone.

■■■ Under the legal standards for ineffective assistance of counsel claims established by *Strickland v. Washington*[16] and *Wiggins v. Smith*,[17] a habeas applicant must show "that counsel's performance was deficient, and that the deficiency prejudiced the defense."[18] To establish deficient performance, applicant must show that her trial counsel's representation " 'fell below an objective standard of reasonableness' " under " 'prevailing professional norms.' "[19] As the Supreme Court has stated:

"Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to

---

**14.** The trial attorney's affidavit does not mention the LBJ emergency room record that documents the thirty-minute faulty intubation and Daniel's seizures as a result of oxygen-starvation.

**15.** One of applicant's medical experts in the writ case filed an amicus brief in this case. Attached to that brief is a copy of her original report with a handwritten notation that she submitted a bill of $350.00 for her review of Daniel's medical records. We will not, however, consider factual materials submitted in briefs for the truth of the matter asserted because this material was not submitted to the trial court. *See Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex.Crim.App.2004).

**16.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**17.** 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

**18.** *Id.* at 521, 123 S.Ct. 2527.

**19.** *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." [20]

 Here, applicant's claim stems from counsel's decision not to fully investigate Daniel's medical records or consult with experts until he had been paid an additional $2500–$7500 in expert fees. This was not a "strategic" decision, it was an economic one. There is no suggestion that trial counsel declined to fully investigate Daniel's medical records because he made a strategic decision that such an investigation was unnecessary or likely to be fruitless or counterproductive. [21] But counsel has an absolute duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues likely to lead to facts relevant to the merits of the case." [22] The decision was made because he had not been paid for experts. Counsel is most assuredly not required to pay expert witness fees or the costs of investigation out of his own pocket, but a reasonably competent attorney—regardless of whether he is retained or appointed—must seek to advance his client's best defense in a reasonably competent manner. [23]

In this case, the clear and obvious defense strategy, which applicant's trial attorney recognized, was to focus on Daniel's medical history and his cause of death. [24]

**20.** *Id.* at 521–22, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052).

**21.** *See id.* at 534, 123 S.Ct. 2527 (trial counsel constitutionally ineffective when "incomplete investigation was the result of inattention, not reasoned strategic judgment").

**22.** ABA Standards for Criminal Justice: The Defense Function, Standard 4–4.1 (2d ed.1986). As the commentary to this Standard states,

> The resources of scientific laboratories may be required to evaluate certain kinds of evidence: analyses of fingerprints or handwriting, clothing, hair, or blood samples, or ballistics tests may be necessary. Neglect of any of these steps may preclude the presentation of an effective defense.

*Id.* at 4–54. If investigation of medical records to determine a child's cause of death is essential to the presentation of an effective defense, counsel cannot decline to conduct such an investigation based on his client's lack of financial resources, but still remain as trial counsel because

> [e]ffective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial or to conduct plea discussions effectively.

*Id.* at 4–55.

**23.** *Brown v. Sternes,* 304 F.3d 677, 693–98 (7th Cir.2002) (noting that "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their client[,]" and concluding that counsel who had access to defendant's medical records "had a professional obligation to do an in-depth investigation into their client's deep-seated psychiatric problems"; failure to do so was ineffective assistance of counsel); *see also Bouchillon v. Collins,* 907 F.2d 589, 595–97 (5th Cir.1990) (trial attorney who failed to do any investigation into client's medical and mental history after he had been informed of prior hospitalizations and who may have persuaded client to plead guilty and accept plea offer was constitutionally ineffective for failing to make adequate investigation when it did not appear that defendant had any other available defense).

**24.** *See Brown,* 304 F.3d at 692 (stating that because "the record establishes that counsel had reason to know, from an objective standpoint, *that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel* ") (emphasis in original; internal quotations and citations omitted).

The sole issue in this case was: How did Daniel die? Was his death a homicide or was it the result of natural causes, exacerbated by improper medical treatment? The fact that Daniel had been oxygen-starved for thirty minutes at LBJ Hospital because the intubation tube was pouring oxygen into his stomach rather than his lungs should have raised immediate cause for concern, even to a layman attorney.

In his letter of May 18, 2000, counsel told applicant that "I have written letters and have verbally requested the balance of my fee, which is over $5,000, as well as money to hire experts. I have been told that there is no money available for either." After noting that his $15,000 fee was "well below the normal minimal fee for murder," counsel stated that he had not charged more "because I knew finances were a problem." But he could not hire experts "unless the money is available to pay for their research and expenses for coming to court to testify." Thus, he did "not feel justified in continuing in this matter through trial for what I have been paid."

When it became clear that applicant could not "come up with" the remainder of the fee or additional money for medical experts, a reasonably competent attorney would have several options:

1. Subpoena all of the doctors who had treated Daniel during the two months of his life to testify at trial. Introduce the medical records through the treating doctors and elicit their expert opinions;

2. If counsel was convinced that applicant could not pay for experts to assist him in preparation for trial or to provide expert testimony, withdraw from the case, explaining to the court that applicant was now indigent, prove that indigency (as was done in the writ proceeding), and request appointment of new counsel; [25]

3. Remain as counsel with the payment of a reduced fee, but request investigatory and expert witness fees from the trial court for a now-indigent client pursuant to *Ake v. Oklahoma*.[26]

More than a decade ago, this Court held that *Ake* applies to the appointment of a defense expert pathologist to investigate a complainant's cause of death when that is a crucial issue in a particular case.[27] Given both the State's and applicant's interest in maintaining "the accuracy of the proceeding," [28] the trial court undoubtedly would have permitted state-funded appointment of expert assistance under *Ake* had applicant's attorney put on proof of his client's present indigency.[29] Failing that, applicant could have appealed on the basis

---

**25.** Indeed, applicant's trial counsel had drafted such a motion which is contained in the writ record, but he never signed it, presented it to the trial court, or obtained permission to withdraw.

**26.** 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (noting that, while the State need not "purchase for the indigent defendant all the assistance that his wealthier counterparts might buy," it must provide him "the basic tools" to present his defense within our adversarial system).

**27.** *Rey v. State* 897 S.W.2d 333, 338 (Tex. Crim.App.1995) (noting that "pathology, like

psychiatry, is a sub-specialty of the science of medicine. Medicine in any of its sub-specialties eludes mathematic precision, as evidenced by the need for a 'second opinion' with regard to any important medical question. Causation or mechanism of death are examples of important medical questions addressed by pathologists that require more than an objective or rote determination").

**28.** *Id.* at 339.

**29.** Refer to note 10, *supra*.

of the trial court's failure to appoint expert assistance under *Ake*.[30]

If any reasonable attorney appointed to represent an indigent defendant would be expected to investigate and request expert assistance to determine a deceased infant's cause of death, a privately retained attorney should be held to no lower standard. As the Supreme Court has explained, "The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection. . . . [W]e see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers." [31]

We conclude that, under these particular circumstances, the failure by applicant's attorney to take any steps to subpoena the treating doctors, withdraw from the case because applicant's indigency prevented him from providing constitutionally effective assistance of counsel, or request state-funded expert assistance under *Ake*, constituted deficient performance. Applicant's trial counsel's *financial* decision to do nothing about the obvious need to develop evidence concerning Daniel's medical history did not reflect reasonable professional judgment.[32] This was not a "strategic" decision made after a full investigation of the facts and law.[33]

We also conclude that this deficient performance prejudiced applicant. In the plea context, a defendant must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"—an assessment that "will depend in large part upon a prediction whether the evidence likely would have changed the outcome of a trial." [34] Applicant was entitled to rely upon her counsel "to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered" [35] based upon an informed investigation of the facts surrounding Daniel's demise. We find

**30.** *See Rey*, 897 S.W.2d at 343 (reversing defendant's capital murder conviction because he did not have access to an expert to testify on his behalf or "technical assistance . . . to help evaluate the strength of [that] defense, . . . and to identify the weaknesses in the State's case, if any, by . . . preparing counsel to cross-examine opposing experts").

**31.** *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

**32.** *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527.

**33.** *Id.*

**34.** *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Ex parte Battle*, 817 S.W.2d 81, 83–84 (Tex.Crim.App.1991) (finding counsel ineffective and defendant entitled to withdraw plea under *Hill* when counsel failed to investigate client's criminal history and assured him that he was eligible for probation when he was not); *Ex parte Pool*, 738 S.W.2d 285, 286 (Tex.Crim.App.1987) (granting habeas relief under *Hill* and withdrawing applicant's guilty plea; noting that "it is fundamental that an attorney representing a defendant must acquaint himself not only with the law but also the facts of the case before he can render reasonably effective assistance of counsel"; here defense counsel relied upon State's assertion that prior DWI convictions could be used for habitual enhancement purposes and thus attorney failed to conduct independent investigation which would have shown that prior convictions could not be used to enhance as habitual).

**35.** *Von Moltke v. Gillies*, 332 U.S. 708, 721, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *see also McMann v. Richardson*, 397 U.S. 759, 769–70, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (defense counsel must make his judgment as to the weight of the state's case and share his predictions with the defendant even though the predictions are necessarily uncertain).

that had applicant's attorney investigated and informed applicant of the significance of Daniel's full medical history—his birth defect, repeated hospitalizations, history of sepsis, evidence of the "bungled" intubation which led to his brain death, and expert testimony explaining his healing fractured rib and bruises on his face—there is a reasonable probability that she would not have pled guilty. Undertaking an objective prediction, "without regard for the 'idiosyncrasies of the particular decisionmaker[,]' "[36] we conclude that it is highly likely that a jury would have returned with a "not guilty" verdict based upon a reasonable doubt concerning the cause of Daniel's death.[37] Although applicant has not proven that she is "unquestionably" innocent, examination of Daniel's full medical records *by themselves,* raise considerable doubt as to the reliability of the original medical examiner's conclusion that Daniel's death was the result of homicide.[38] When those records are coupled with the testimony of the current Harris County Chief Medical Examiner and the other expert opinions offered during the writ proceeding, we conclude that there is a "probability sufficient to undermine con-

fidence in the outcome" that Daniel's death was the result of a criminal act.[39]

We therefore grant applicant relief. The judgment in cause number 815234 from the 232nd District Court of Harris County, Texas, is vacated. Applicant is remanded to the custody of the Sheriff of Harris County to answer to the indictment.

A copy of this opinion shall be sent to the Texas Department of Criminal Justice, Correctional Institutions Division.

KELLER, P.J., filed a dissenting opinion.

KELLER, P.J., dissenting.

The trial court made a number of findings adverse to applicant's allegations and recommended denying relief. In my opinion, the Court does not sufficiently address those adverse findings. Because I think the trial court's findings are supported by the record and compel denying relief here, I dissent.

Applicant claims, among other things, that her trial attorney did not investigate

---

36. *Hill,* 474 U.S. at 59–60, 106 S.Ct. 366. In *Hill,* the Court stated that

> where the alleged error of counsel is a failure to investigate ... the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend in large part on a prediction whether the evidence likely would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend ... in large part on a prediction whether the evidence likely would have changed the outcome of a trial.... [T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker."

*Id.*

37. *See Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527 (in assessing prejudice under *Strickland*

in the context of a failure to investigate claim, "we evaluate the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]'* " in determining that, had the jury been confronted with the uninvestigated evidence, "there is a reasonable probability that it would have returned with a different sentence" or verdict) (emphasis in original; *quoting Williams v. Taylor,* 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

38. In defense of the original pathologist and her report, there is no evidence in the record that suggests that she had access to these voluminous medical records at the time she performed her autopsy the day after Daniel's death.

39. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

any medical records involving her son. She claims that the attorney told her that, unless she paid eight to ten thousand dollars for an expert, she would go to prison for twenty years or more, or perhaps for life. She further claims that her attorney and the prosecutor told her that if she pled guilty she would get deferred adjudication. She also claims that counsel told her to make up a story about shaking the baby in order to get probation.

All of these claims were denied by counsel in his affidavit dated April 8, 2004. Counsel specifically stated that he not only reviewed the medical records, but he highlighted the portions of those records that posed problems for the defense, and he discussed those records with applicant in detail, including the highlighted portions. He acknowledged that he told applicant that she needed to pay him to hire a medical expert to review those records and compare them to brochures he had ordered regarding a similar disease, and that the cost could range from $2500 to $7500. At no time, however, did he claim that if she failed to do so she would go to prison. The entire time, applicant and her family told defense counsel that "they were working on getting some money" for an expert. But they never did pay counsel for an expert. On the date of trial, the prosecutor offered to agree to a plea to the lesser offense of reckless injury to a child, a second degree felony, instead of the first degree intentional injury to a child offense applicant was charged with. Counsel further stated in his affidavit that he never told applicant to make up a story about shaking the baby and applicant was never promised probation or deferred adjudication.

In an amendment to her application, dated May 17, 2004, applicant contended, among other things, that a May 18, 2000 letter from trial counsel showed that appli-

cant had no money to hire experts. In that letter counsel stated that he had written letters and verbally requested the balance of his fee, as well as money to hire experts, but was "told that there is no money available for either." He further told applicant that his fee was low for a murder prosecution but he had not increased his fee because he "knew finances were a problem." Counsel told applicant that he could not continue on the case without being paid the balance of his fee and would probably present a motion to withdraw. His draft of the motion to withdraw (which he never filed) stated that he had not been paid his fee and "has been advised there are no funds available for any payments in the future" and requested that the trial court permit him to withdraw from the case. In the amendment, applicant faulted counsel for not petitioning the trial court to have an expert appointed.

The trial court chose to believe trial counsel. Based on the documents filed in the habeas action, the official records of the challenged conviction, testimony from the evidentiary hearing held on the application, and the trial court's own recollection, the trial court specifically found that applicant was not credible and that her trial counsel and the prosecutor were credible individuals. The trial court found that defense counsel did not tell applicant that she would go to prison if she did not pay for an expert. The trial court found that neither trial counsel nor the prosecutor promised applicant that the judge would give her any form of probation. The trial court further found that trial counsel was aware of the victim's pre-existing medical condition and had perused the medical records pertaining to that condition. The trial court found that applicant's guilty plea was entered "freely and voluntarily, with a full understanding of the consequences of doing so." And the trial court found that "there is no evidence that applicant was

indigent at any time before she pled guilty."

The Court contends that trial counsel should have done one of three things when it became clear that applicant could not come up with the remainder of the fee or additional money for medical experts. First, the Court claims that counsel could have subpoenaed all the treating physicians to testify at trial, introduce the medical records, and elicit their opinions. The Court does not point to any evidence in the record to show that counsel did *not* subpoena those witnesses. But assuming *arguendo* that counsel did not do so, that failure could be reasonable trial strategy because counsel could reasonably believe that the treating physicians would testify adversely to his client. And in fact, applicant has not presented affidavits or testimony from the treating physicians with this application, although she could, presumably, have subpoenaed them to the writ hearing. As stated above, counsel had discussed the medical documentation with his client, and that discussion included problems that portions of documents appeared to pose for the defense. To the extent the documents are exculpatory, counsel could also reasonably believe that he could use them to cross-examine the State's experts—accomplishing the objective set out by the Court. But counsel was not required to go to trial because applicant chose of her own free will to plead guilty. Counsel could reasonably believe applicant was unwilling rather than unable to pay for a defense expert. Counsel could also reasonably believe that applicant's decision to plead guilty was an intelligent one, given that the medical documents were not entirely exculpatory. Counsel could also reasonably believe that applicant pled guilty, rather than going to trial, because she was guilty and going to trial

risked a much harsher sentence than the maximum allowed in the plea agreement.

The Court's second option is that counsel, if convinced that applicant could not pay for experts to assist him, could ask to withdraw from the case, prove indigence, and request the appointment of new counsel. But the trial court concluded that there was no evidence of indigence. The Court claims that indigence was proven in the writ proceeding, but the only matters cited by applicant as evidence of indigence are a letter and a draft motion stating that the attorney had been told that there were no funds available for future payments. The "unavailability of funds" and "finances" being "a problem" are not, standing alone, sufficient to show indigence. It may be that applicant had the resources to obtain the funds but was unwilling to make hard economic choices that required doing so,[1] especially if she thought that because she was guilty, an expert would find evidence of her guilt. Moreover, the trial court was free to believe counsel's statement that throughout the entire time, applicant and her family told him "they were working on getting some money." Even if the May 18th letter constituted an indication of indigence, which it did not, applicant's trial date did not arrive until October 2nd, and the trial court could have believed that these assurances about getting the money were made after the letter, and are the reason counsel did not follow through on his avowed intention to withdraw from the case.

Finally, the Court claims that counsel could have remained for a reduced fee and requested investigatory and expert witness fees for a now-indigent client. But again, the trial court concluded that there is no evidence that applicant was indigent at any time before she pled guilty, and that con-

---

1. *See Whitehead v. State,* 130 S.W.3d 866 (Tex.Crim.App.2004).

clusion appears to comport with the record, both in the original proceeding and on habeas.

Based on the trial court's findings—including those about applicant's credibility, the voluntariness of the plea, and the absence of evidence of indigence—I would deny relief. I respectfully dissent.