

# NUMBERS
# 13-11-00709-CR
# 13-11-00710-CR
# 13-11-00711-CR
# 13-11-00712-CR
# 13-11-00713-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ESTEBAN TREVINO,                                                      Appellant,

v.

THE STATE OF TEXAS,                                                  Appellee.

### On appeal from the 130th District Court of
### Matagorda County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Perkes
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Esteban Trevino, of seven offenses related to the

sexual abuse of his granddaughters: two counts of aggravated sexual assault, a first-

degree felony; two counts of attempted aggravated sexual assault, a second-degree

felony[1]; and three counts of indecency with a child, a second-degree felony.[2]  *See* TEX. PENAL CODE ANN. § 21.11 (West 2011), § 22.021 (West Supp. 2011).  The jury sentenced appellant to life imprisonment for the aggravated sexual assault counts and twenty years' imprisonment for each of the second-degree felonies.[3]  Appellant now challenges his convictions by three issues.  We affirm.

## I. BACKGROUND

Three children were involved in the allegations against appellant:  I.M., M.E.T., and S.Z.  I.M. and M.E.T., who were eight and nine years of age respectively at the time of the alleged abuse, are the daughters of appellant's daughter Sarah.  S.Z., who was seven years of age at the time of the alleged abuse, is the daughter of appellant's other daughter Linda.

Appellant's son, Stephen, testified at trial that his nieces I.M. and M.E.T. came with their mother Sarah to visit him at his home in San Antonio in July of 2009.  When Stephen asked the girls how their grandfather was doing, I.M. and M.E.T. replied:  "We're not allowed to see him no more."  When he asked why not, they stated:  "Mom won't let us go see him no more . . . .  He pulled out his private on us and he showed us his private."  Stephen waited until the girls left with Sarah; he then called Sarah and advised her what the girls had said.  Stephen told Sarah to contact police in Palacios, Texas, where appellant lived at the time.  He told Sarah that, if she did not go to the police, he "was going to put a complaint with CPS and get custody."  Stephen also

---

[1] One count of aggravated sexual assault and one count of attempted aggravated sexual assault are appealed in appellate cause number 13-11-00709-CR.  The other count of aggravated sexual assault and the other count of attempted aggravated sexual assault are appealed in appellate cause number 13-11-00710-CR.

[2] Appellate cause numbers 13-11-00711-CR, 13-11-00712-CR, and 13-11-00713-CR.

[3] The punishments for the second-degree felonies were ordered to run concurrently.  The punishments for the aggravated sexual assault convictions were ordered to run consecutively.

2

called Juan Morales, I.M.'s father, and told him what the girls said.

Sarah testified that, on or about July 1, 2009, Linda was about to give birth and so Linda sent S.Z. to stay with appellant in Palacios. Initially, I.M. and M.E.T. did not want to go along, but they eventually decided to accompany S.Z. The children stayed with appellant for one night, and Sarah then went to Palacios to pick them up the next day. When they came home, everything appeared normal. However, two weeks later, when the family was returning from their visit to San Antonio, Sarah received information from both Linda and Juan, her ex-husband, regarding the accusations against appellant.

Sarah asked her children if anything had happened to them at their grandfather's house. The children repeatedly denied that anything had happened. However, on August 17, 2009, they reported that appellant "has touched them, that he has put his thing in between—in between their legs, rubbing their legs with his middle part." Sarah then took her children to the police department in Palacios and made a sexual abuse complaint against her father. According to Sarah, Linda didn't want anything to happen to appellant and was angry that Sarah made the report to police. Sarah suggested that the children "were scared to say anything" at first "[b]ecause the last time I talked to my kids about any—anybody touching them in an inappropriate way, I [told them I] would kill 'em. That's why my kids was [sic] scared to tell me."

Susan Maxwell, an investigator with the Matagorda County District Attorney's Office, testified that she interviewed I.M. in October 2009. According to Maxwell, I.M. reported that appellant "put his middle part in her middle part" and "put his finger in her middle part and that it hurt." I.M. reported that this happened at appellant's house in Palacios when Linda had gone to the hospital to have her baby. When Maxwell asked

3

I.M. to describe appellant's private part, I.M. stated that it was "hard and hairy" and that "some either yucky or nasty yellow stuff came out and that she had seen it on the other two girls' bod[ies]."

S.Z. testified that she, along with I.M. and M.E.T., went to stay with appellant while her mother was having a baby. The girls slept on the floor in appellant's bedroom.[4] S.Z. stated that, after the girls had taken a shower, appellant "told us to put our hands on his middle" and then "just grabbed our hands and just put it on it." S.Z. recalled "yellow gushy stuff" coming out of his "middle part." S.Z. also stated that appellant put his fingers in her "middle part."

S.Z. testified that appellant "picked [S.Z.] up" and put her on the bed, and that "[t]he next thing when I woke up, my clothes were off." She recalled that the other two girls "were trying to get my grandpa off of me, but they couldn't because he was too heavy." S.Z. agreed with the prosecutor that appellant was "on top of [her]" at that time. She was sure that appellant had "put his middle in [her] middle," but she stated that this occurred after "anything came out of his middle." S.Z. also noted that she was asleep at the time "he put his middle on [her] middle" and knew what had happened only because she felt pain in her "middle" and because her cousins M.E.T. and I.M. told her that appellant was on top of her.

S.Z. initially denied that appellant "ever ask[ed] you or ma[d]e you put your mouth on his private part"; however, she later conceded that "[h]e told us to put our mouth on his middle . . . . He just grabbed our heads. . . . Just made us put it on his middle."

According to S.Z., appellant instructed her not to tell her mother what happened, and he told M.E.T. "not to tell your mom or else I'll hurt you." S.Z. stated that her

---

[4] Appellant shared the bedroom with his girlfriend. However, according to S.Z., appellant's girlfriend did not sleep in the bedroom while the children were staying with them.

4

mother, Linda, told her that she did not have to talk about what happened if she did not want to.

I.M. testified that, when the girls were in appellant's bedroom, "[h]e would like take off his clothes and then start touching us." She stated that, while she was sleeping, appellant would remove her clothes and put her on the bed. He would then use his hand and his "middle" to touch "[her] belly and [her] leg," and he did the same to the other girls. He would grab her hand and tell her to touch his "middle." I.M. agreed with the prosecutor that appellant "would make [M.E.T. and S.Z.] put their mouth on his private." When the prosecutor asked if appellant had "touch[ed] [her] up top," I.M. stated: "He was trying to, but I told him to stop." She also stated that appellant "[t]ried" to "put his middle part on [her] middle part" but that she told him not to, and he didn't. I.M. testified that these acts occurred "[a] lot of times," both in appellant's bedroom and in a "motel" where he used to live. According to I.M., appellant "said if you tell anybody, you're never going to see your mama again."

M.E.T. testified that, when she was at appellant's house during the time her aunt Linda was having a baby, appellant undressed and got into bed with her and her cousins. He then "got on top of [S.Z.]." He was "moving" rather than staying still. The girls tried to "pull him off" because they thought S.Z. was going to get hurt. M.E.T. agreed with the prosecutor that appellant had, in the past, tried to "do the same things with you." M.E.T. testified that appellant made S.Z. and I.M. touch his "middle part" and that "white stuff" came out of his "middle." According to M.E.T., appellant touched her leg "with his middle."

More than two years after the events in question, the girls were taken for physical examinations by sexual assault nurse examiners ("SANE nurses"). The examinations

5

revealed no visual injuries or indications of recent sexual activity.

Appellant was tried on four counts of aggravated sexual assault and three counts of indecency with a child. The jury found him guilty of two aggravated sexual assault counts[5] and all three indecency counts.[6] It found appellant not guilty of the two other aggravated sexual assault counts but, with respect to each charge, found him guilty of the lesser-included offense of attempted aggravated sexual assault.[7] Appellant filed a motion for new trial, which was denied. This appeal followed.

## II. DISCUSSION

### A. Admission of SANE Nurse Testimony

By his first issue, appellant contends that the trial court erred in admitting the testimony of the two SANE nurses, Leslie Kallus and Jennifer Mumphord, who conducted examinations of the alleged victims. In particular, appellant complains that the nurses were improperly permitted to recount details of the allegations made by the children during the examinations. At trial, defense counsel objected to the admission of Kallus's testimony on the basis that it constituted improper "bolstering" of the children's testimony. The prosecutor argued that the testimony was admissible because it was relevant and constituted an exception to the hearsay rule. *See* TEX. R. EVID. 803(4) (providing that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history . . ." are not excluded by the hearsay rule). The trial court

---

[5] The two aggravated sexual assault convictions were for: (1) appellant intentionally or knowingly causing the penetration of S.Z.'s sexual organ by his sexual organ; and (2) appellant intentionally or knowingly causing I.M.'s sexual organ to contact his sexual organ. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(1)(B)(iii) (West Supp. 2011).

[6] The three indecency with a child counts were for appellant intentionally or knowingly, with intent to arouse or gratify his sexual desire, causing each of the three victims to touch his genitals. *See id.* § 21.11(a)(1), (c)(2) (West 2011).

[7] The two attempted aggravated sexual assault convictions were for appellant attempting to intentionally or knowingly cause the penetration of the sexual organ of S.Z. and I.M., respectively, by his finger. *See id.* § 22.021(a)(1)(B)(i).

6

overruled defense counsel's objection. On appeal, appellant argues that the testimony was inadmissible because it was irrelevant and constituted improper bolstering.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). "If the trial court's decision was within the bounds of reasonable disagreement, the appellate court should not disturb its ruling." *Id.*

Appellant's trial counsel did not object to the testimony on the basis of relevance. The issue of relevance has therefore not been preserved for our review. *See* TEX. R. APP. P. 33.1. Even if the issue had been preserved, it would not be meritorious. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Evidence which is not relevant is inadmissible. TEX. R. EVID. 402. The testimony of the nurses as to the children's accounts of abuse by their grandfather tended to make more probable the fact that the abuse actually took place. Accordingly, the evidence was relevant.

Appellant cites *Salinas v. State*, 166 S.W.3d 368, 371–72 (Tex. App.—Fort Worth 2005, pet. ref'd), in which the Fort Worth Court of Appeals found that the trial court abused its discretion in admitting a doctor's testimony that she had diagnosed sexual abuse based only on the medical history provided by the alleged child victim. But in the case at bar, the SANE nurses did not make any diagnosis based on the accounts of the children. Instead, the nurses testified that, based on the results of the physical examinations, they could not confirm or negate the children's allegations.

Appellant further cites *Yount v. State*, 872 S.W.2d 706, 711 n.8 (Tex. Crim. App. 1993), in which the Texas Court of Criminal Appeals noted that "[v]irtually every

7

jurisdiction which has addressed, in the context of a child sexual assault case, the admissibility of direct testimony as to the truthfulness of the child complainant, has held that such direct testimony is inadmissible." However, neither SANE nurse gave any opinion about the truthfulness of the alleged victims; on the contrary, as noted, they stated affirmatively that the physical examinations were inconclusive and that they could not confirm or negate the allegations of abuse.

Appellant next claims that the nurses' testimony regarding the children's accusations constituted improper "bolstering" of the children's testimony.[8] However, we recently held in an unpublished memorandum opinion that "'bolstering' is no longer a valid objection where testimony is not deemed to be hearsay." *Valencia v. State*, No. 13-10-00201-CR, 2011 Tex. App. LEXIS 3815, at *17–18 (Tex. App.–Corpus Christi May 19, 2011, no pet.) (mem. op., not designated for publication) (citing *Jones v. State*, 833 S.W.2d 634, 635 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd); *White v. State*, No. 01-98-00148-CR, 1999 Tex. App. LEXIS 5072, at *6 (Tex. App.—Houston [1st Dist.] July 8, 1999, no pet.) (mem. op., not designated for publication)). As noted, the challenged testimony falls under an exception to the hearsay rule. *See* TEX. R. EVID. 803(4). Accordingly, "bolstering" is not a cognizable objection in this instance. *See Valencia*, 2011 Tex. App. LEXIS 3815, at *17–18.

Appellant's first issue is overruled.

## B.    Ineffective Assistance of Counsel

Appellant contends by his second and third issues that his trial counsel was ineffective, depriving him of his right to a fair trial as guaranteed by the Sixth Amendment to the United States Constitution. *See* U.S. CONST. amend. VI.

---

[8] Appellant notes that his main defensive theory at trial was that the children's initial statements contradicted their later accusations of abuse. He alleges that the nurses' testimony caused him to suffer harm because it lent additional credence to the children's accusations.

### 1. Standard of Review and Applicable Law

To obtain a reversal of a conviction for ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). The prejudice prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 248 (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). "[E]ach case must be judged on its own unique facts." *Davis*, 278 S.W.3d at 353.

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (noting that, "unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a

strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate"). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 814 n.6.

### 2.    Mumphord

By his second issue, appellant contends that his trial counsel was ineffective for failing to object to the testimony of SANE nurse Mumphord. However, there is nothing in the record[9] establishing that this could not have been "the product of a strategic or tactical decision" on the part of defense counsel. *See Morales*, 253 S.W.3d at 696. In particular, counsel could have declined to object to this testimony because it showed that there was no evidence of any physical injuries to S.Z. at the time of the Mumphord's examination. Appellant notes that, though his trial counsel failed to object to Mumphord's testimony, he did object to Kallus's testimony. Appellant claims that "[t]here can be no legitimate strategy in objecting to Nurse Kallus'[s] testimony and not objecting to Nurse Mumphord's testimony" because "[t]he objection to Nurse Mumphord would have been identical [to the objection to Kallus]." But even if we assume that counsel performed deficiently in this regard, appellant has not established that an objection to Mumphord's testimony would have been sustained. *See Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002) (stating that a claim of ineffective assistance based on failure to object to the admission of evidence must establish that the evidence

---

[9] The defense attorney who cross-examined Kallus testified at the motion for new trial hearing. However, the defense attorney who cross-examined Mumphord did not testify.

10

was inadmissible).  Failure to make such an objection cannot, therefore, support a claim of ineffective assistance.  *See id.*  We overrule appellant's second issue.

### 3.    Expert Witness

By his third issue, appellant argues that his trial counsel "failed to conduct a meaningful investigation of the law and facts necessary to present a defense."  *See Strickland*, 466 U.S. at 690–91 (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").  In particular, appellant contends that counsel should have called an expert witness to present scientific literature regarding the potential for children to be manipulated by adults into giving false testimony.

Appellant's brief cites several scholarly works which he believes could have been presented by an expert at trial and which would have been beneficial to his defense.[10] At the hearing on appellant's motion for new trial, his trial counsel conceded that he was aware of many of these studies but did not consult with an expert regarding "the issue of contamination and motive for a child to bring a false allegation of sexual abuse."  Trial counsel acknowledged that, although "one of [his] trial strategies was to raise the issue of contamination," he did not "have anyone explain to the jury how contamination works and how a parent or aunt can cause or contaminate the opinions or testimony of a child."

---

[10] The scholarly works referenced by appellant include an article that, according to appellant's counsel, established that "a parent can influence [an eight-to-ten-year-old child] to make a false allegation of sexual abuse."  The works also included an article that, according to counsel, stated that "55 percent of child sexual abuse cases were either inconclusive findings or deemed not to be sexual abuse in the allegations."

11

Appellant cites *S.J.P. v. Thaler*, in which the federal district court for the Northern District of Texas held that a sex abuse defendant had received constitutionally inadequate assistance from his trial counsel, in part because counsel failed "to consult with a health care expert, a psychiatrist or psychologist, on the subject of how to deal with the statements [the alleged child victim and her mother] were making against petitioner." No. 4:09-CV-112-A, 2010 U.S. Dist. LEXIS 127904, at *73 (N.D. Tex. Dec. 3, 2010). In that case, the accused contended, as appellant did in his trial, that the child complainant's testimony was contaminated by the influence of an adult. The court held that:

> any reasonable attorney handling petitioner's defense would have retained an expert qualified by education and experience as a forensic psychologist or psychiatrist to assist in preparation of petitioner's defense and to give testimony, as appropriate, on the mental status of [the mother] and [the child] and on the subject of [the mother]'s influence over [the child].

*Id.* at *87.

Appellant also cites *Ex parte Ard*, No. AP-75,704, 2009 Tex. Crim. App. Unpub. LEXIS 181 (Tex. Crim. App. Mar. 11, 2009) (not designated for publication) and *Ex parte Briggs*, 187 S.W.3d 458 (Tex. Crim. App. 2005), two cases in which the Texas Court of Criminal Appeals vacated convictions on the basis of inadequate assistance of trial counsel. In *Ard*, the Court found that the record supported the trial court's conclusion that defense counsel provided ineffective assistance by "fail[ing] to challenge the competency and credibility of the alleged victim, the lone witness testifying that a sexual assault had occurred, based on the scientific theory of memory implantation." 2009 Tex. Crim. App. Unpub. LEXIS 181, at *5, *18. In *Briggs*, the habeas corpus applicant argued that she had been wrongly convicted of causing the death of her two-month-old son, and she contended that her trial counsel was deficient because he

12

"deci[ded] not to fully investigate [the child victim's] medical records or consult with experts until he had been paid an additional $2500–$7500 in expert fees." 187 S.W.3d at 467. The Court held that counsel provided ineffective assistance in part because "[t]his was not a 'strategic' decision, it was an economic one." *Id.* The Court stated: "Counsel is most assuredly not required to pay expert witness fees or the costs of investigation out of his own pocket, but a reasonably competent attorney—regardless of whether he is retained or appointed—must seek to advance his client's best defense in a reasonably competent manner." *Id.* (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (noting that, while the State need not "purchase for the indigent defendant all the assistance that his wealthier counterparts might buy," it must provide him "the basic tools" to present his defense within our adversarial system)). The Court held:

> under these particular circumstances, the failure by applicant's attorney to take any steps to subpoena the treating doctors, withdraw from the case because applicant's indigency prevented him from providing constitutionally effective assistance of counsel, or request state-funded expert assistance under *Ake*, constituted deficient performance. Applicant's trial counsel's *financial* decision to do nothing about the obvious need to develop evidence concerning [the child's] medical history did not reflect reasonable professional judgment. This was not a "strategic" decision made after a full investigation of the facts and law.

*Id.* at 469 (footnotes omitted).

Appellant argues that *S.J.P.*, *Ard*, and *Briggs* compel reversal of his conviction. We disagree. *S.J.P.* is distinguishable because that court, in concluding that trial counsel's assistance was deficient under *Strickland*, relied upon far more than just counsel's failure to consult with a mental health expert. *See Thompson*, 9 S.W.3d at 813 (noting that effectiveness is judged by the totality of counsel's representation, not by isolated acts or omissions); *Jaynes*, 216 S.W.3d at 851 (same). Instead, the court

13

noted the following additional deficiencies in counsel's representation which were apparent from the record:

- "defense counsel were poorly prepared for cross-examination of any of the witnesses, and failed to conduct any effective cross-examination," 2010 U.S. Dist. LEXIS 127904, at *56;

- "trial counsel made no effort to rebut [the mother]'s allegation that petitioner molested [the child] when she was twenty months old or to otherwise convince the jury that the incident did not happen," *id.* at *51;

- defense counsel repeatedly "injected into the record by cross-examination of [the mother] and [the child] accusations of inappropriate or irrational conduct on the part of one or both of them, but when the questions were met with denials, defense counsel made no attempt to establish the falsity of the denials," *id.* at *57;

- defense counsel failed to call several available witnesses "who would have been able to testify to facts that would have strengthened defense counsel's theory that [the mother] was mentally unstable and had an inordinate influence on the thinking and conduct of [the child]," *id.* at *58–59;

- defense counsel offered as evidence letters and a journal authored by the child which "served the interests of the prosecutor rather than petitioner by substantiating [the child]'s contentions of sexual abuse" and counsel "were unprepared to discredit the writings in any respect," *id.* at *59; and

- "no one on the defense team interviewed any prospective witness prior to the trial." *Id.* at *88.

Here, there is no allegation that trial counsel was unprepared to cross-examine witnesses, that counsel introduced evidence detrimental to appellant's defense, or that

14

counsel failed to interview prospective witnesses. Moreover, although appellant refers to scholarly works casting doubt on the veracity of child witness testimony, the record does not show that any particular expert witness was available to testify as to the reliability or scientific validity of those works or how they apply to appellant's case. For these reasons, we do not believe that *S.J.P.* compels reversal in this case.

*Ard* is also distinguishable. In that case, the habeas corpus applicant established a record showing that an expert on the subject of memory implantation "was ready and able to explain how false memory may be implanted by repetitious suggestion" but that trial counsel nevertheless

> failed to adequately elicit testimony from the doctor that the theory is the subject of many treatises and is widely accepted by the scientific community, to explain how and why it can occur, and to enumerate those facts which, in his opinion, made the testimony of the alleged victim in the case suspect and unreliable.

2009 Tex. Crim. App. Unpub. LEXIS 181, at *5. Here, on the other hand, no expert testified at the hearing on appellant's motion for new trial, and—despite appellant's citations to various scholarly works—the record does not establish that any particular expert "was ready and able" to testify that the accusations of M.E.T., I.M., and S.Z. may have been false due to "implantation," "contamination," or other undue influence by adults. *See Teixeira v. State*, 89 S.W.3d 190, 194 (Tex. App.—Texarkana 2002, pet. ref'd) (holding that a *Strickland* challenge "is not sustainable" without "some showing in the record that an expert would have testified in a manner that would have benefitted" appellant, and stating that "[w]e are unwilling to take the position that an expert must be obtained in all sexual assault cases"); *see also Garcia v. State*, No. 13-11-00016-CR, 2012 Tex. App. LEXIS 4369, at *12 (Tex. App.—Corpus Christi May 31, 2012, pet. ref'd) (mem. op., not designated for publication).

15

Finally, in *Briggs*, the Court noted that medical records which were not presented at trial "*by themselves* raise considerable doubt as to the reliability of the original medical examiner's conclusion that [the child's] death was the result of homicide." 187 S.W.3d at 470. In particular, the medical records showed that the child victim suffered from a birth defect and that emergency-room personnel at the hospital where the child was treated "mistakenly inserted an endotracheal (oxygen) tube into his stomach instead of his lungs"—a finding which, when revealed, caused the Harris County Chief Medical Examiner to change the cause of death on the child's death report from "homicide" to "undetermined." *Id.* at 460. The Court noted that the "need to develop evidence concerning [the child]'s medical history" was "obvious" and that counsel's "*financial* decision to do nothing" to address that need "did not reflect reasonable professional judgment." *Id.* at 469.

At the motion for new trial hearing, appellant's substitute counsel asked trial counsel why he did not present any testimony, other than through cross-examination, as to the pertinent academic literature "that went to the heart of your strategies." Counsel replied:

> The problem that we had with that was—is that presenting that type of defense and strategy, we were very concerned that would open the door perhaps to [appellant's] prior convictions for sexual assault[11] because the primary motive of the so-called money motive[12] was Sarah and Linda. So, any—any issue regarding opening the door to Sarah or Linda might open the door to the prior convictions. So, we were very sensitive about that given the facts of the prior convictions. If that were to come out in this trial—and I understand what you're saying regarding the experts, but consulting an expert in my opinion is on a case-by-case basis. And in this particular case, the facts of the prior convictions were far worse than the facts in this case. And we did everything we could do to make sure that

---

[11] Counsel testified that appellant had two previous sexual assault convictions.

[12] Counsel refers here to the suggestion made at various times during the hearing that Linda may have encouraged her daughter, S.Z., to make false claims of sexual abuse because appellant had stopped providing financial support to Linda.

didn't happen. And the issues you're touching on could very well have opened the door to those issues.

Counsel explained that this was "one of the reasons" why he did not consult an expert, or ask the court for funds to hire an expert, on the topic of children potentially fabricating reports of sexual abuse. When substitute counsel asked if it would be "impossible to develop a defense" without opening the door to appellant's criminal history, trial counsel replied:

> Yeah. I believe it would be—it would be next to impossible because the— it would be very difficult because of—there's some facts—there's some facts in this case that you're avoiding or you may not know about that would have opened the door to the prior convictions. There are—that's— that's the whole gist of the family dynamic is the prior convictions, and that would have opened the door. It would have.

Considering this testimony, we cannot conclude, as the courts did in *Briggs*, *Ard*, and *S.J.P.*, that counsel failed to use reasonable professional judgment. According to counsel's testimony, the decision not to consult or retain an expert or ask the trial court for funds to do so was not a "financial" decision; it was a tactical decision made with the explicit objective of preventing the jury from being made aware of appellant's prior convictions for crimes similar to those for which he was being tried. Moreover, in direct contrast to *Briggs*, there is nothing in the record in this case indicating an "obvious" need to develop potentially exculpatory evidence.

We conclude that appellant has failed to overcome the "strong presumption" that trial counsel's decision not to consult an expert can be considered "sound trial strategy." *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. We overrule his third issue.

17

## III. CONCLUSION

The judgments of the trial court are affirmed.

                             _____

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
11th day of July, 2013.