ACCEPTED
06-15-00012-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
10/20/2015 2:27:29 PM
DEBBIE AUTREY
CLERK

**No. 06-15-00012-CR, 06-15-00013-CR, 06-15-00014-CR, 06-15-00015-CR, 06-15-00016-CR, 06-15-00017-CR**

In the Court of Appeals for the
Sixth District of Texas
At Texarkana

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

10/20/2015 2:27:29 PM

DEBBIE AUTREY
Clerk

_____

**GARY MORROW,**
**Appellant**

*v.*

**STATE OF TEXAS,**
**Appellee**

_____

**APPEAL IN CAUSE NOs.  CR-13-24716, CR-13-24717, CR-13-24718, CR-13-24719, CR-13-24720, CR-13-24722**

**FROM THE 336TH DISTRICT COURT**

**OF FANNIN COUNTY, TEXAS**

_____

**APPELLANT'S BRIEF**

_____

Micah Belden
TBN.: 24044294
711 N. Travis
Sherman, Texas 75090
P.: 903-744-4252
F.: 903-893-1734
ATTORNEY FOR APPELLANT

**ORAL ARGUMENT NOT REQUESTED**

i

**TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………………...ii

IDENTITY OF PARTIES AND COUNSEL.................................................................iii

INDEX OF AUTHORITIES........................................................................................iv

STATEMENT OF THE CASE......................................................................................vi

STATEMENT OF JURISDICTION.............................................................................vi

ISSUES PRESENTED…………..…..………………………………………..…·vi

STATEMENT OF FACTS.............................................................................................1

SUMMARY OF ARGUMENT…. …………………………………………..…….14

ARGUMENT…………………………………………………………..…..14

CONCLUSION AND PRAYER...................................................................................28

CERTIFICATE OF SERVICE....................................................................................28

CERTIFICATE OF COMPLIANCE..........................................................................29

## IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties to the Trial Court's Judgment and their counsel in the Trial Court:

**THE STATE OF TEXAS** / Appellee:   Mr. Richard Glaser, Elected District Attorney
Brad Setterberg, Assistant District Attorney
101 E. Sam Rayburn
Bonham, TX 75418
P.: (903) 583-7448
F.: (903) 583-7682

**GARY MORROW** /Appellant:   Mr. Micah Belden
Attorney at Law
711 N. Travis
Sherman, TX 75090
P.: (903) 744-4252
F.: (903) 893-1734

# INDEX OF AUTHORITIES

## CASES

*Alexander v. State,* 753 S.W.2d 390 (Tex.Crim.App.1988)                    26

*Apolinar v. State*, 155 S.W.3d 184 (Tex. Crim. App. 2005)                 25

*Barber v. State,* 737 S.W.2d 824 (Tex.Crim.App.1987)                      21

*Barshaw v. State*, 342 S.W.3d 91 (Tex.Crim.App. 2011)                     24

*Bone v. State*, 77 S.W.3d 828 (Tex. Crim. App. 2002)                      15

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990)                      15

*Brooks v. State,* 323 S.W.3d 893 (Tex.Crim.App.2010)                      26

*Buckner v. Polk*, 453 F.3d 195 (4th Cir. 2006)                            19

*Chambers v. State*, 903 S.W.2d 21 (Tex. Crim. App. 1995)                  15

*Ex parte Amezquita*, 223 S.W.3d 363 (Tex. Crim. App. 2006)               16

*Ex Parte Briggs*, 187 S.W.3d 458, 469 (Tex. Crim. App. 2005)             17

*Ex parte Gonzales,* 204 S.W.3d 391 (Tex. Crim. App. 2006)                16

*Ex Parte Lahood,* 401 S.W.3d 45 (Tex. Crim. App. 2013)                   15

*Ex parte Rich*, 194 S.W.2d 508 (Tex. Crim. App. 2006)                    16

*Greene v. State*, 264 S.W.3d 271 (Tex.App. San Antonio, 2008, p.d.r. ref'd)    21

*Hartsfield v. State,* 305 S.W.3d 859 (Tex.App.-Texarkana 2010, pet. ref'd)    26

*Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App.1986)                 15

*Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005)                 19

*Jackson v. Virginia,* 443 U.S. 307 (1979)                                26

*Langham v. State*, 305 S.W.3D 568, 580 (Tex. Crim. App. 2010)            23

*Lasiter v. State*, 283 S.W.3d 909 (Tex. App. – Beaumont, 2009, p.d.r. ref'd)  20

*Mack v. State*, 928 S.W.2d 219 (Tex. App. – Austin, 1996, p.d.r. ref'd)  27

*Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App.1997)  26

*Murray v. Carrier*, 477 U.S. 478 (1986)  20

*Nero v. Blackburn*, 597 F.2d 991 (5th Cir. 1979)  20

*Rodriguez v. State*, 329 S.W.3d 74, 78 (Tex. App. – Houston [14th Dist] 2010, no pet.)  20

*Rompilla v. Beard*, 545 U.S. 374 (2005)  16

*Strickland v. Washington*, 466 U.S. 668 (1984)  18

*United States v. Cronic*, 466 U.S. 648 (1984)  20

*Wilkerson v. State*, 726 S.W.2d 542 (Tex. Crim. App. 1986)  16

*Williams v. Taylor*, 529 U.S. 362 (2000)  19

## **STATUTES**

Code of Criminal Procedure 46B.004  21

Texas Family Code section 3.102  28

Tex. Penal Code Ann. § 1.07  26

Tex. Penal Code Ann. § 30.02  26

## **RULES**

Texas Rule of Evidence 802  23

Tex. R. App. P. 44  23

## STATEMENT OF THE CASE

On July 18, 2013, Appellant Gary Christopher Morrow was indicted in cause number CR-13-24716 for aggravated sexual assault, CR 13, burglary of a habitation in CR-13-24717, one count of aggravated assault in each of CR-13-24718, CR-13-24719, and CR-13-24720, and aggravated kidnapping in CR-13-24722. CR 13 (in each case). On January 23, 2015, the Court entered judgments of conviction in each case, sentencing Mr. Morrow to 40 years confinement in CR-13-24716 (CR 197-98), 20 years confinement in CR-13-24717 (CR 192), 20 years confinement in CR-13-24718 (CR 195), 20 years confinement in CR-13-24719 (CR 195-96), CR-13-24720 (CR 195-96), and 30 years confinement in CR-13-24722. Mr. Morrow was acquitted of aggravated sexual assault in CR-13-24721. On April 8, 2015, a live hearing was conducted on the motion for new trial on evidence outside the record, and the motion was denied. On appeal, Mr. Morrow brings five points of error.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to hear this appeal pursuant to § 4.03 of the Texas Code of Criminal Procedure.

## ISSUES PRESENTED

1. **COUNSEL WAS INEFFECTIVE FOR NOT INVESTIGATING FACTS LEADING TO A POTENTIAL INSANITY DEFENSE, AND NOT INVESTIGATING AND PRESENTING MITIGATION FACTS AT PUNISHMENT.**

2. **THE TRIAL COURT ERRED IN NOT CONDUCTING AN INFORMAL COMPETENCY EVALUATION UPON REQUEST OF COUNSEL OR SUA SPONTE.**

3. **MR. MORROW'S TRIAL CONTAINED IMPROPER HEARSAY THAT EXCEEDED ANY ADMISSIBLE "BACKGROUND" SCOPE.**

4. **MR. MORROW'S PUNISHMENT TRIAL CONTAINED IMPROPER HEARSAY CONCERNING BAD ACTS, INCLUDING INFIDELITY AND ABUSE.**

5. **THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT MR. MORROW OF BURGLARY.**

**TO THE HONORABLE JUDGES OF THE SIXTH COURT OF APPEALS:**

COMES NOW, Appellant Gary Morrow, ("Mr. Morrow"), and submits this brief pursuant to Rule 38.1 of the Texas Rules of Appellate Procedure, appealing the convictions and sentences in these causes entered January 23, 2015. Appellee is referred to as "the State." Mr. Morrow requests that this Honorable Court of Appeals reverse the conviction and punishment in each case and remand these cases for new trials.

## STATEMENT OF FACTS

Gina Morrow testified that she was the wife of Gary Morrow and the mother of Marissa and Andrea Yarbrough. RR 3 at 48. Around November of 2012, the Morrows moved into a new house at 1343 County Road 2230 in Ivanhoe, Fannin County, Texas. *Id.*, at 52. On January 17, 2013, Gina Morrow filed for divorce from Mr. Morrow, and moved with her children to McKinney. *Id.*, at 49, 54. She stated she spent "every other week" at the Ivanhoe residence based on a verbal agreement made between the two spouses within the divorce in March of 2013, and that Mr. Morrow had moved out by March 16. *Id.*, at 56. The State entered Exhibit 1, which was a motion to modify temporary orders filed by Mr. Morrow's divorce lawyer in Collin County District Court on March 13, 2013. *See* State's Exhibit 1. State's Exhibit 2 is an unsigned proposed order reflecting the agreement claimed by Ms. Morrow. *Id.*, at 62.

Ms. Morrow testified that she was staying in Ivanhoe, Texas on the night of May 4-5, 2013 along with her boyfriend Donnie Mangum, Marissa Yarborough, and four other children. *Id.*, at 64-65. She went to bed around 1:30 A.M., and woke up when Gary Morrow turned the light on and was standing at the foot of her bed. RR 3 at 67. Mr.

1

Morrow said "what the fuck are you doing" and was standing over her with a pistol. *Id.*, at 68. Mr. Morrow then put the gun on Mr. Mangum, who was laying beside her, and said "who the fuck is that?" *Id.*, at 69. Mr. Morrow threatened to kill her and "smoke the whole house" if her screaming woke up the kids. *Id.*, at 70-72.

Mr. Morrow, who was in a camouflage outfit with a black doo rag, asked Ms. Morrow and Donnie Mangum a series of questions including about each party's relationships and Mr. Mangum's anatomical details. *Id.*, at 72-75. At some point, Mr. Morrow punched Mr. Mangum. *Id.*, 81-82. Ms. Morrow was allowed to go get Marissa and bring her into the room. RR 3 at 82-85. Ms. Morrow stated that Mr. Morrow pointed the gun at everyone in the room and said he was going to kill everyone in the house, and then made Mr. Mangum display his penis. *Id.*, at 85-87. Ms. Morrow asked if everyone could go outside, and eventually Mr. Morrow led the three of them outside with the gun to her back. *Id.*, at 88-90. After reading text messages between Ms. Morrow and Mr. Mangum and having her confirm her love for Mr. Mangum, Mr. Morrow "unconditionally" stated he was going to kill everyone. *Id.*, at 90.

Mr. Mangum walked out the front door before everyone else and "took off." *Id.*, at 93-95. When they all went outside, Mr. Morrow kept asking Ms. Morrow if they could work their relationship out. *Id.*, at 96. While outside, she testified that Mr. Morrow punched her. RR 3 at 100. Mr. Morrow told Ms. Morrow he wanted oral sex, and that if she does everything he says and answers his questions, nothing bad will happen. *Id.*, at 102. She testified he forced her to get in her truck with him, at which time she gave him oral sex and vaginal sex, which was interrupted when he saw police

2

lights. *Id.*, at 103-110. Mr. Morrow disappeared, Ms. Morrow got into the house with everyone and called 911, and authorities showed up shortly thereafter. *Id.*, at 111-118.

Mr. Morrow called Ms. Morrow on the phone immediately and talked about forgiveness and getting back together, and asked her to call the cops off. *Id.*, 119-122. Ms. Morrow was eventually taken to the Greenville hospital for a SANE exam. *Id.*, at 128. Mr. Morrow called her the next day to talk to her one last time before he killed himself. RR 3 at 136.

Ms. Morrow stated on cross examination that the deed to the house was in both her and Mr. Morrow's names. *Id.*, at 142. She repeated that she lived off and on both in Ivanhoe and Frisco, Texas for about a year. *Id.*, at 146. She noted that Mr. Morrow said he was going to kill himself that night when they were in the bedroom and outside, and she received calls the next day from Sandy Curran that Mr. Morrow was suicidal. *Id.*, at 192 – 193.

Marissa Yarborough and Donnie Mangum generally corroborated Ms. Morrow's testimony about the timeline of the interaction with Mr. Morrow on the night in question. *Id.*, at 204-266.

Marsha Skinner York testified that her friend Gary Morrow showed up at her apartment in Howe, Texas on the morning of May 5, 2013 around 5:20 AM, was dressed in a camouflage shirt, refused to say what was going on, and asked if he could crash on her couch. RR 4 at 277-79. Mr. Morrow had called her repeatedly since 4:00AM that morning. *Id.* At 8:30AM, he woke her up asking if she had a baseball hat and telling her

3

that he found his wife in bed with another man. *Id.*, at 280. He asked to borrow Ms. York's car to go down the street, then left and came back in about 5 minutes. *Id.*, at 281.

Mr. Morrow asked her to go to the store for him and gave her a $100 bill, then a $20 bill. *Id.*, at 282-85. She described his demeanor as calm but demanding, and that she had not seen him in that condition before. *Id.* She saw a state trooper downstairs, and when she and her female friend tried to get in the truck, the two of them were confronted by the police. RR 4 at 286-87. They stayed at the scene about three and a half hours while the police talked Mr. Morrow out of their apartment. *Id.*, at 288. The police searched her apartment and didn't find a gun, but she searched under the bed and found it. *Id.*, at 290-93.

Jordan Clark of the Howe Police Department testified to negotiating Mr. Morrow, who at first stated he wasn't going to come out of the apartment and was very "angry, animated and emotional," out of the apartment in Howe. *Id.*, at 192-93. Officer Clark established a rapport with Mr. Morrow over several hours and several phone calls, during which time Mr. Morrow would go through the emotional spectrum from calm to angry. *Id.*, at 194. Over four hours of phone calls Mr. Morrow stated he was going to harm himself, wasn't going to exit the apartment, but wasn't going to harm officers. *Id.*, at 196. Mr. Morrow finally complied with the officer's instructions and surrendered himself peacefully. RR 4 at 199-200.

After conviction in these cases, Mr. Morrow's criminal history was introduced which included: a 2004 felony deferred adjudication probation for fraudulent possession of identifying information with several motions to adjudicate, eventually resolved

4

without revocation; a 2007 probation for failure to identify/fugitive from justice; a 2001 probation for violation of a protective order; a 2008 conviction for theft $500<$1500; and a 2004 misdemeanor probation for stalking, with various motions to revoke having been filed. RR 11 at 246, Exhibit 150-54. The state introduced Exhibit 155, a video of Mr. Morrow brokering a deal at his and Ms. Morrow's salon to hire third parties to inflict injury on an ex-wife's husband and also snorting a line of a substance, and exhibit 156 of Mr. Morrow talking harshly to his mother on the telephone and admitting to the deal with his attorney to let Ms. Morrow have temporary possession of the house.

The State's punishment case also centered on calling each of Mr. Morrow's ex-wives, and one of his children's mothers, to testify to multiple incidents of verbal and physical abuse at the hands of Mr. Morrow, as well as stalking, possessive behavior, incidents of infidelity by Mr. Morrow, and him threatening their physical well-being. RR 9.

Mr. Morrow's counsel called John Turnage, who testified that Mr. Morrow attended Mr. Turnage's beauty school, was hardworking and seemed genuinely interested in bettering himself and in helping his step-daughter's career, and that Mr. Morrow would be a good candidate to be on probation and follow the rules. RR 10 at 13-26.

Ms. Morrow's mother, Sheila Morrow, testified that Mr. Morrow's biological dad left her when she was pregnant with him, but Mr. Morrow was subsequently adopted by her next husband who raised Mr. Morrow as his own. *Id.*, at 33-34. Mr. Morrow was upset when he found out he was adopted when he was 17. *Id.*, at 35. She claimed she forced him and Susan Morrow to marry when Susan got pregnant when they were young,

and that Susan was the first aggressor in violent situations. *Id.*, at 37-39. She testified that Mr. Morrow was in a bad car accident that hurt his neck and head and gave him headaches. *Id.*, at 41-42. She said she would always be there for her son, even though their relationship isn't perfect, and that they both stand up to each other. *Id.*, at 44-45. She testified that Mr. Morrow had never been convicted of a felony, that he goes through a lot of "depressions," wanted to die and was taken in for a mental health evaluation at some point. RR 10 at 46-49.

Brent Nelson testified that he met Mr. Morrow in church in 1994, became reacquainted with him four years before trial, and that they went to church together in Sherman more than a "handful" of times. *Id.*, at 104-106.

Christina Lemons testified that she was friends with Mr. Morrow since 2012, and he has been a gentleman around her and in interacting with others in front of her. *Id.*, 112-115.

Mandy Morrow testified that Mr. Morrow was a good father to her, they visited regularly growing up, and that she got in trouble sometimes but was not afraid of her father. *Id.*, 118-119.

Cody Morrow testified that Mr. Morrow was his father and they visited regularly growing up, and Mr. Morrow made him obey the rules and he only feared his dad from an "obedience standpoint." *Id.,* at 123-124. Mr. Morrow coached him growing up and took him to a memorable football game. *Id.*, at 125-126. Cody admitted being pushed down and a drink thrown in his face by Mr. Morrow slightly before he moved back in with his mother. RR 10 at 127-128.

6

At the motion for new trial hearing herein, Mr. Morrow presented his medical records through the custodians of records for Parkland Hospital and Medical Center of McKinney. RR MNT supplement at 11-13, Defendant's Exhibit 1 & 2 on Motion for New Trial. Mr. Morrow then called and got admitted medical records from the Fannin County jail. RR MNT supplement at 14, Defendant's Exhibit 3.

Trial Counsel was called, and he stated that, early in the representation, he became aware Mr. Morrow had mental health issues, including an apparent suicide attempt and hospitalization. RR MNT supplement at 15. He stated he was not informed that Mr. Morrow had a history of depression, but believed from his nursing experience that such a diagnosis "usually" accompanies suicide attempts. *Id.*, at 16. He believed Mr. Morrow and/or his mother told him that he had gone to Parkland Hospital and to Green Oaks, where he was released, but could not recall exactly what was said by Sheila Morrow. *Id.*, at 20. He noted that Defendant's Exhibit 4 was his notes from a conversation with Mr. Morrow, and Defendant's Exhibit 5 was a letter sent to him by Sheila Morrow. *Id.* Defendant's Exhibit 6 was also a letter sent to him by Sheila Morrow. *Id.*, at 24.

Ms. Morrow let Trial Counsel know that Mr. Morrow was suffering from sleep deprivation, depression and was "not thinking straight" in Defendant's Exhibit 6, her letter dated January 24, 2013 (which circumstantially was probably January 24, 2014, as the same date in 2013 would have preceded the incidents in question). *Id.*, at 25. Defendant's Exhibit 7, the Howe Police Department incident report from this case, and Defendant's Exhibit 8, the comprehensive Fannin County Sheriff's Office report, were admitted. RR MNT supplement at 27-33. Defendant's Exhibit 9 was also admitted.

7

Trial Counsel stated that he did not ask for a mental health expert because Mr. Morrow never appeared insane, and nothing in the case record indicated that other than suicide threats which Mr. Morrow told a detective were calculated to gauge his wife's emotions. *Id.*, at 36. He did not think Mr. Morrow was insane at the time of the event or while representing him nor incompetent. *Id.*, at 36-37.

Trial counsel conceded that that he had not seen Mr. Morrow's medical records prior to the motion for new trial. *Id.*, at 38. Trial counsel stated that he did not want to obtain them if they were evidence of substance abuse and suicide attempts, because he thought that evidence of suicidal thoughts would be negatively received due to jurors' religious beliefs. *Id.*, at 38-40. He also did not want Mr. Morrow's suicidal statements to David Thompson coming back in that were suppressible. *Id.*, at 41. Counsel stated

> I felt like if I then tried to and say Well, he – you know, here he has threatened to commit suicide in the past and he's drank too much alcohol and took too many pills in the past, I would have effectively – rather than offering mitigating punishment or mitigating evidence, I'd be offering evidence of a drug user, evidence of a alcoholic, and somebody who drinks and uses those together. And as – now that I've reviewed the records, it seems that's exactly what it seems to me that he then said. I didn't want that damning evidence into the trial – it seems unusual, I know.

*Id.* Trial Counsel conceded that Mr. Morrow's drug use and suicide ideations came in at trial. RR MNT supplement at 41-43. But, he denied that getting a psychologist appointed would have been beneficial in hindsight, and even a mitigation expert would have been more damaging than helpful. *Id.* at 44-45.

Trial Counsel stated he was led to believe there were two hospitalizations – one for overdose, and one for threat of suicide - and at Green Oaks he was evaluated for being

suicidal and released. *Id.*, at 47. He stated he believed these were isolated incidents and was afraid of the state getting a copy of what was in the records. *Id.*, at 49. Trial counsel stated his competency suggestion during trial should not have been made, because he had an inadequate basis to suggest such, and was just afraid he might have missed something. *Id.*, at 60. He noted that Mr. Morrow had "a lot of mood swings. You never knew which way he was going to go. One day, he'd be hugging you, and the next day, he'd hate me." *Id.*, at 64.

Trial counsel stated he would not have had more basis for a competency request if he had seen Medical Center of McKinney's major depressive disorder diagnosis of Mr. Morrow. RR MNT supplement at 65. He has also never requested a mental health mitigation expert in his career, although he understood he could do this process ex parte, and that he could have requested Mr. Morrow's medical records under a HIPPA release. *Id.*, at 66-67. Trial Counsel believed his mental health investigation was adequate although he had not received Mr. Morrow's medical records nor talked to any treatment providers. *Id.*, at 68-69. He admitted he didn't know if Mr. Morrow was clinically depressed. *Id.*, at 71.

Sheila Morrow then testified that she told Trial Counsel about Mr. Morrow's headaches, depression and sleep deprivation after one of the first hearings in the case, and that Mr. Morrow had been treated for these issues before. *Id.*, at 75-77. She also told him that Mr. Morrow tried to commit suicide and noted the scars on his arm. *Id.*, at 77. She was personally aware of three suicide attempts. *Id.* The hospitalization in McKinney was the one brought to Trial Counsel's attention. RR MNT supplement at 78.

Sheila Morrow stated that Mr. Morrow started showing these symptoms about 1995 or 1996, and he started cutting on himself about a year later. *Id.*, at 79-81. She told Trial Counsel that Mr. Morrow had gone three weeks without sleep at one point, but was unable to commit him because she was not his spouse. *Id.*, at 82. She noted that Mr. Morrow's bad headaches would come a couple times a month, and that during his depressions he couldn't sit still without crying. *Id.*, at 86-87. She testified that his condition lasted throughout the time from 1996 to the present day. *Id.*, at 87-88. Sheila Morrow had to concede there were no documented suicide attempts in 1996. *Id.*, 91-95. She also noted a day where he put a gun in his mouth around 1993-1994, during a crying episode. RR MNT supplement at 97-98.

The Court denied current Counsel's request to have mental health expert appointed to examine Mr. Morrow and report his findings. *Id.*, at 103. The State called David Thompson to sponsor State's Motion for New Trial Exhibit 1, a jail call between Mr. Morrow and Sheila Morrow.

A review of the exhibits shows that Defendant's Exhibit 1 reflects that Mr. Morrow self-admitted to Dallas County Hospital (Parkland) on August 7, 1996 to see if he had a "chemical imbalance." Defendant's Exhibit 1, at 2. He admitted a history of drinking but that he had quit, and he complained of highs and lows, appetite and weight loss, worry, insomnia, anhedonia. *Id.* He was diagnosed by Dr. James Elder with major depressive disorder, moderate recurrent. *Id.* He was prescribed an SSRI and Trazodone when discharged the next day. *Id.* at 3. His nursing notes seem to indicate he has struggled with depression "for most of his life." *Id.* at 6.

10

Defendant's Exhibit 2 reflects an October 2012 drug overdose/suicide attempt in which Mr. Morrow arrived at Medical Center of McKinney by ambulance. Defendant's Exhibit 2 at 11. The summary states that he was found with pill bottles around him and that he "consumes a large amount of liquor daily." *Id.* It noted recent "situational problems" with his wife. *Id.* The clinical impression, signed by Dr. Keven Martens, was stated as:

> Overdose.
> Depression with suicidal ideation and suicide attempt.
> Involuntary commitment…

*Id.* at 14. In the nursing progress notes it states that he "admits to being depressed and wanting to hurt himself." *Id.* at 16. Dr. Martens filled out a physician's certificate of medical examination for mental illness for an involuntarily commitment, noting that Mr. Morrow has major depressive disorder. *Id.* at 27.

On Exhibit 3, Mr. Morrow answered that he has been very depressed recently when he was booked into the Fannin County Jail on 5/5/13. Defendant's Exhibit 3, p. 29. On the next page, he says he is going to "hang himself" in the Progress Notes on 9/23/13. *Id.* at 30. On a "Referral Triage Form" later in the exhibit, it is noted that he "had torn sheet and made statement he is going to hang himself," but later claimed to be joking.

Defendant's Exhibit 4 is Trial Counsel's handwritten notes noting that he was informed about Mr. Morrow being "very depressed" and his treatment in Green Oaks at some point. Defendant's Exhibits 5 and 6 are letters from Sheila Morrow to Trial Counsel drawing attention to Mr. Morrow's mental health. In Exhibit 5 she says "I also told the attorney about Chris' depression over the divorce and sleep deprivation. He

11

wanted to know why you did not have a medical evaluation performed on him when you were told about it?" *Id.* p. 2.

On Defendant's Exhibit 6, Ms. Morrow says in her timeline:

05/04/13. Gary goes out to the house. Due to weeks of sleep deprivation and depression he is not thinking straight. (please don't shoot this down because I know he wasn't sleeping and I have read a lot on what sleep deprivation can due to a person. Also, I have a brother going through the same thing. I have all of his text and his kids as witnesses as what it is doing to him. Including suicidal thoughts.) Then the Incident occurs.

Exhibit 6, p. 2.

In Defendant's Exhibit 7 at page 6, Morrow told the Howe officer that he had "no intentions of exiting the apartment alive...Morrow kept saying that he was going to 'end it' or he would even say that he was going to kill himself...Morrow would sometimes become very upset and stated 'if you want me to kill myself keep being so pushy.'"

Exhibit 8 is the comprehensive police report, which on page 3 notes that "[d]uring the investigation and while speaking with Gina, Gary was calling her making suicidal threats. Gina further advised that Gary had made suicidal threats throughout the incident." Page 4 notes that the deputies were dispatched that evening for a "suicidal" subject later identified as Gary Morrow, including that "he stated that he was going to kill himself and there was nothing anyone could do to help him." Morrow admitted to David Thompson that he "thought about suicide," and stated he pointed the gun at himself in the house to see if Gina "cared." *Id.* at 8. Defendant's Exhibit 9 was admitted as another piece of evidence in Trial Counsel's possession of Mr. Morrow having a history of mental illness.

# MIDTRIAL COMPETENCY SUGGESTION

In Volume 9 at page 152, during the punishment phase and prior to Susan

Calloway's testimony, Trial Counsel suggested that, based on the evidence in the case

and the lack of Mr. Morrow following instructions, that he may be "mentally ill" to the

Court:

> MR. FRITTS: Your Honor, considering this and the way things have gone, despite advice and admonitions to the contrary from the Court -- not just from me, but from the Court, I almost feel like I am -- well, no, I don't. I feel like I must move for the Court to consider that the defendant may very well be mentally ill. Now, it seems that there is a -- in my -- in my --
> THE COURT: You mean based on what we've just heard?
> MR. FRITTS: Well, based on that and based on the trial and -- and the fact that if the Court will recall, we had a massive hearing of all these people when there was a question about whether something was said, and the Court admonished every witness, as I remember, admonished the defendant -- or at least the defendant was present during that hearing.
> It appears to me that somehow there is a considerable fetish or -- or maybe not a fetish, but a belief in this idea that God is going to do something. And in my experience, sometimes mentally-ill people tend to have these kinds of religious complexes, and just out of a matter and abundance of caution, I'm going to move that the Court consider that. The Court may deny my motion, but I just don't know what else to do in that situation.
> I'm afraid I can't -- I can't put it on -- put -- I cannot specifically say what it might be other than that. It's just that it makes no sense that someone would constantly -
> THE COURT: Not follow what they've been told, Mr. Fritts?
> MR. FRITTS: Yes, when it's so –
> THE COURT: I've been on the bench for ten years. This isn't a first, Mr. Fritts.
> MR. FRITTS: Very well, Your Honor. I just, I -- I feel, out of an abundance of caution, I should make that motion
> THE COURT: I don't see anything to ind-- to support any issues of mental illness such that the defendant would be -- lack competence, and nothing in that regard has been said. But there's nothing supported in the record because somebody refuses to follow the Court's instruction. That doesn't rise to that level. I think everybody I had to revoke on probation would have to be found mentally incompetent, Mr. Fritts, if that was the standard and it's not the standard. So whatever your motion was, it's going to be denied.

RR 9, 152- 154.

## SUMMARY OF THE ARGUMENT

Counsel failed to uncover Mr. Morrow's major depressive diagnosis and history of hospitalizations in his investigation, including a hospitalization and involuntary commitment within a year of trial, and without these facts was unable to develop an insanity defense nor present a competent mitigation case at punishment. The Trial Court also failed to sua sponte, or upon an apparent request, conduct an informal competency hearing regarding Mr. Morrow. Inadmissible hearsay came in at both guilt innocence and punishment. Finally, the evidence was legally insufficient to convict Mr. Morrow of burglarizing his own community property home.

## ARGUMENT

1. **COUNSEL WAS INEFFECTIVE FOR NOT INVESTIGATING FACTS LEADING TO A POTENTIAL INSANITY DEFENSE, AND NOT INVESTIGATING AND PRESENTING MITIGATION FACTS AT PUNISHMENT.**

The motion for new trial revealed that Mr. Morrow had a major mental health diagnosis, major depressive disorder, of which counsel was unaware throughout his representation. This was not uncovered in the case's investigation nor presented in mitigation of punishment, but only the generalized depression and suicide testimony of Sheila Morrow. Trial Counsel was unaware of this medical diagnosis and the other information from the medical records when he failed to request a competency evaluation until halfway through the punishment stage, when he decided not to explore a potential insanity defense, and in not presenting the defendant's full mental health diagnosis, history and records in mitigation of punishment. For the later alone, a new trial on

14

punishment is warranted. This failure to investigate falls below any objective standard of reasonableness, and there is a reasonable probability that the result – a 40 year aggravated prison sentence and lesser concurrent sentences for a man with no prior felony convictions – would have been different.

For the failure to investigate facts that would lead to a potential insanity defense, a new trial on guilt is be warranted if Morrow can show harm. Mr. Morrow was, for the most part, prevented from showing harm in the motion for new trial because he was denied the appointment of an expert. However, a review of the record reveals evidence to support a potential defense and charge on insanity.

Attorneys have a clear duty to investigate the facts and circumstances of their client's case and to explore *all* available avenues regarding potential evidence. *Ex Parte Lahood,* 401 S.W.3d 45 (Tex. Crim. App. 2013). *See Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), (trial attorney who failed to do any investigation into client's medical and mental history after he had been informed of prior hospitalizations and who may have persuaded client to plead guilty and accept plea offer was constitutionally ineffective for failing to make adequate investigation when it did not appear that defendant had any other available defense.) Here, Mr. Morrow had little evidence to offer in mitigation of punishment outside of his mental health history and diagnosis.

The *Strickland* standard was adopted in Texas by *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App.1986). Review is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Chambers v. State*, 903 S.W.2d 21,

15

33 (Tex. Crim. App. 1995). Review is undertaken in light of the "totality of the representation" rather than by examining isolated acts or omissions of trial counsel. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). Here, in totality Trial Counsel's actions were ineffective and Mr. Morrow was prejudiced.

Texas Courts have made the duty to investigate very clear. *Ex parte Amezquita*, 223 S.W.3d 363 (Tex. Crim. App. 2006); *Ex parte Gonzales,* 204 S.W.3d 391 (Tex. Crim. App. 2006); *Ex parte Rich*, 194 S.W.2d 508 (Tex. Crim. App. 2006). An attorney has to investigate the witnesses in every criminal case. The failure to investigate witnesses is not trial strategy. It is well below an objective standard of reasonableness. Trial Counsel's failure to do so here prejudiced Morrow in that he was denied his only real defense of insanity, and his best mitigating evidence of his long history of major depressive disorder, including hospitalizations and medical records of the same, which was the only vehicle to help mitigate his behavior and rebut the State's case that he was a violent antisocial criminal. Trial Counsel offered little in the way of a real defense to all but one of his charges, and his strategy of doing so without fully investigating the mental health evidence was ineffective assistance. His self-serving testimony at the motion for new trial does not outline a valid strategy for failing to investigate evidence to which he has been put on notice, nor was his decision to not investigate the medical records and mental health diagnosis reasonable.

The Supreme Court in *Rompilla v. Beard* noted:

[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.

16

545 U.S. 374, 387 (2005) (citing 1 American Bar Association Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) (emphasis added). In *Ex Parte Briggs*, 187 S.W.3d 458, 469 (Tex. Crim. App. 2005), the Court of Criminal Appeals noted that "[a]pplicant was entitled to rely upon [his] counsel 'to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered."

Here, Trial did not explore all avenues leading to facts relevant to the case, most importantly the critical mental health facts which would have likely benefited Mr. Morrow in this trial. Counsel could not make an informed decision on a suggestion of incompetency, a defense of temporary insanity, or present a competent mitigation case based on a long history major depressive disorder, a hospitalization including an involuntary commitment within the year of the incident, without obtaining the records and/or talking to the treatment providers.

The Court of Criminal Appeals reversed a capital murder conviction for a similar inadequate investigation in *Ex Parte Gonzales*, 204 S.W.3d 391. In *Gonzales*, counsel actually talked to the witnesses he should have talked to, but failed to investigate properly and was found ineffective for not discovering evidence that was mitigating in a capital murder case. The court outlined the test for failure to investigate:

> Defense counsel's failure to investigate the basis of his client's mitigation defense can amount to ineffective assistance of counsel. In determining whether counsel conducted a reasonable investigation, an appellate court's initial inquiry is whether a reasonable investigation should have uncovered the mitigating evidence.

17

A reasonable investigation here would have uncovered the mitigating evidence. Trial Counsel's failing to investigate prevented developing evidence of serious mental illness to go to an insanity defense, and a full mitigation defense based on mental illness. Harm has been shown under *Strickland*, as outlined below, on the failure to investigate and present evidence in mitigation of punishment.

> In *Strickland v. Washington*, the Supreme Court stated:
>
> > The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled.

466 U.S. 668, 685 (1984) (quotations and citations omitted). *Strickland* established that an appellant is entitled to relief for ineffective assistance of counsel if he satisfies the following two prongs:

> > (1) that trial counsel's performance was deficient, meaning that the performance fell below an objective standard of reasonableness—a standard determined with reference to prevailing professional standards and from counsel's actual point of view during the representation; and
>
> > (2) that but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different.

*Id.* at 687–91.

Thus, Mr. Morrow is entitled to relief based on ineffective assistance of counsel if he demonstrates (1) trial counsel's performance was deficient, meaning that the performance fell below an objective standard of reasonableness; and (2) but for counsel's deficient performance, there is a reasonable probability the result of the proceeding

18

would have been different. *Id.* at 687–88. Courts should determine "whether counsel's assistance was reasonable [after] *considering all the circumstances*." *Id.* at 688 (emphasis added). With respect to prejudice, a petitioner is not required to make a separate or additional showing that his counsel's deficient performance rendered his trial "fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 397 (2000). A "reasonable probability" the result would have been different is a "probability *sufficient* to undermine confidence in the outcome" at trial. *Id.* at 695. This test is not outcome determinative.

The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* (emphasis supplied). Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[1] The Supreme Court reiterated this point in *Williams v. Taylor*, expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. 529 U.S. at 405-06.

---

[1] In *Bouchillon*, 907 F.2d 589, the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Id.* at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id.*; *see also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

19

While courts hesitate to designate any error as ineffective assistance *per se*, it is possible that a single egregious error of omission by an applicant's counsel constitutes ineffective assistance as a matter of law. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986); *United States v. Cronic*, 466 U.S. 648, 658–62 (1984); *Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979).

Here, Mr. Morrow has shown, at a minimum, that Trial Counsel performed deficiently and there is a reasonable probability that his lengthy punishment verdict would have been different had his diagnosis and the medical records been presented in mitigation of punishment. Thus, a remand for a new punishment trial is warranted. Mr. Morrow has also shown deficient performance with result to his potential insanity defense, and the Court should reverse his convictions and remand for a new trial if his "prejudice" analysis meets the minimum requirements of *Strickland.*

### 2. THE TRIAL COURT ERRED IN NOT CONDUCTING AN INFORMAL COMPETENCY EVALUATION UPON REQUEST OF COUNSEL OR SUA SPONTE.

Mr. Morrow was also denied an informal competency evaluation herein. "…Texas competency statutes allow competency to be raised, by either party or the judge, at any time before sentence is pronounced. New evidence on competency may be considered in a motion for new trial." *Lasiter v. State*, 283 S.W.3d 909 (Tex. App. – Beaumont, 2009, p.d.r. ref'd). A Court's implicit decision to not *sua sponte* conduct an informal inquiry is reviewed for an abuse of discretion. *Rodriguez v. State*, 329 S.W.3d 74, 78 (Tex. App. – Houston [14th Dist] 2010, no pet.).

Code of Criminal Procedure 46B.004(c) states that "[o]n suggestion that the defendant may be incompetent to stand trial, the court *shall* determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." (emphasis added).  Trial Counsel made that suggestion midway through punishment as outlined in the factual recitation above.  However, the Court took no action on his suggestion, nor at any other point through the motion for new trial.  Mr. Morrow was not questioned about his mental health history nor was Trial Counsel or any other party.

The "bona fide doubt" standard in *Rodriguez* was modified by statute in 2011.  Texas Code of Criminal Procedure 46B.004(c-1) now states:

> (c-1)  A suggestion of incompetency is the threshold requirement for an informal inquiry under Subsection (c) and may consist solely of a representation from any credible source that the defendant may be incompetent.  A further evidentiary showing is not required to initiate the inquiry, and *the court is not required to have a bona fide doubt about the competency of the defendant*.  Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that the defendant is incompetent within the meaning of Article 46B.003.

An informal inquiry into Mr. Morrow's competency was improperly denied under the case law above and the new (c-1) addition.   The remedy is a new trial, because a jury trial on the issue of competency at the time of the formal trial would deny due process.  *Greene v. State*, 264 S.W.3d 271 (Tex.App. San Antonio, 2008, p.d.r. ref'd).

### 3. MR. MORROW'S TRIAL CONTAINED IMPROPER HEARSAY THAT EXCEEDED ANY ADMISSIBLE "BACKGROUND" SCOPE.

Mr. Morrow deserves a new trial on guilt/innocence because of numerous hearsay statements being admitted at his trial. Officer Clint Praslicka was allowed over hearsay objections that:

> Donnie Mangum "advised that the of the other victims -- her estranged husband had broke into the house and threatened to -- threatened to kill him with a gun." RR 4 at 15.

> Gina Morrow "advised that her ex-husband had broken in through the -- forced his way into the entrance through a back window to the garage, had entered her bedroom, had turned on the lights and pointed a gun at herself and the white male who was identified as Donny Magnum, forced them to get out of the bed and threatened them with a gun." *Id.* at 18-19.

> "[Gina] Morrow told me that as they approached the front door of the residence, her daughter had asked to get a cigarette before they stepped outside, at which point Donny was able to escape out the front door and to the neighbor's house on FM 273." *Id.* at 27-28.

> "She advised that he had ordered her daughter -- I believe her name was Marissa -- to stay on the porch while he forced the victim, Gina Morrow, to go to the truck that was parked in front of the residence." *Id.* at 28.

> "She advised that the suspect had forced her into the house -- into the vehicle, at which point he then forced her to perform oral sex on him." *Id.* at 28-29.

> "She advised that while they were still in the vehicle, the suspect had saw our lights at the neighbor's house and made a threat towards her that if she had called the police, that she would -- that he would kill her." *Id.* at 30.

> "As I recall, I believe he then left the scene." *Id.* at 31.

Also, Kaleb Hackney testified that Donnie Mangum:

> stated that there was a strange man at his house. He stated the gentleman had come into his residence and he had just been held at gunpoint, and he ran away from the man in which at that point, that's what made him scared, along with the fact of the gentleman at the residence pulling a gun on him.

*Id.* at 161.

Counsel's reading of the record reflects none of these statements being offered for the limited purpose of "background," and all appear to have been admitted for the truth of the matter asserted in violation of Texas Rule of Evidence 802. *Langham v. State*, 305 S.W.3D 568, 580 (Tex. Crim. App. 2010) established that "background" evidence can become improper:

> Typically, so-called "background" evidence is admissible, not because it has particularly compelling probative value with respect to the elements of the alleged offense, but simply because it provides the jury with perspective, so that the jury is equipped to evaluate, in proper context, *other* evidence that more directly relates to elemental facts. But it is not necessary to go into elaborate detail in setting the evidentiary scene, and there is a danger inherent in doing so. Because the relevance of "background" evidence is marginal to begin with, the introduction of too much incriminating detail may, whenever the evidence has some objectionable quality not related to its marginal relevance, prove far more prejudicial than probative. Thus, even when a confidential informant's out-of-court statement showing "background" is not *offered* for the truth of the matter asserted, its probative value to place other, more direct evidence in an understandable context will usually be slight compared to its tendency to cause the jury to consider it for that improper, truth-of-the-matter-asserted purpose. And the greater and more damning the detail contained in that out-of-court statement, the greater the likelihood that the jury will gravitate toward the improper use.

Here, the hearsay statements above went beyond "background" and into specific details of the offense, and bolstered witnesses. They were timely objected to as hearsay. Although *Langham* is partially distinguishable as the improper evidence was both from a confidential informant and also objected to as a Confrontation Clause violation, the potential for improper use is the same as in this case. The harm analysis is only lowered to a non-Constitutional harm analysis as "not affecting substantial rights." Tex. R. App.

P. 44(b). *Barshaw v. State*, 342 S.W.3d 91 (Tex.Crim.App. 2011). Along with other hearsay below, Mr. Morrow's substantial rights were affected.

### 4. MR. MORROW'S PUNISHMENT TRIAL CONTAINED IMPROPER HEARSAY CONCERNING BAD ACTS, INCLUDING INFIDELITY AND ABUSE.

Mr. Morrow's punishment trial should be reversed because it contained improper hearsay concerning conversations his spouses had with third parties regarding his infidelity, and one hearsay statement of a child that he was abusive.

Gina Morrow was allowed to testify over a hearsay objection to statements of a third party female she purportedly read on Chris's phone, in which the female was telling Chris how much she loved and missed him. RR 9 p. 11-12. Ms. Morrow also testified to confronting Mr. Morrow about what third parties were "telling her" over a hearsay objection. *Id.* at 21-22.

Susan Morrow was allowed to testify over a hearsay objection that she had a conversation with Gina Morrow about Mr. Morrow's "status in the marriage, his fidelity…" *Id.* at 122. She was also allowed to testify over a hearsay objection that Mr. Morrow had been on a Plenty of Fish dating website. *Id.* at 125.

Claudia Ramirez was allowed to testify over a hearsay objection that her children ran away, and upon being found her son said he did not want to live with Mr. Morrow anymore because he was "mentally abusive" to them. *Id.* 191-193. The condition the child was in was simply stated as "very emotional."

24

The State offered this statement as an excited utterance under Rule 803(2), but the statement fails the test under *Apolinar v. State*, 155 S.W.3d 184, 186-187 (Tex. Crim. App. 2005). There, the Court stated:

> [t]o determine whether a statement is an excited utterance, trial courts should determine "whether the declarant was still dominated by the emotions, excitement, fear or pain of the event or condition' when the statement is made. Factors that the trial court may consider include the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving. A useful rule of thumb is that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotion upset will often suffice."

Here, Ms. Ramirez's son made a self-serving statement that Mr. Morrow was "mentally abusive" to him in general when he was caught by Mr. Morrow running away from home. There was no proof of when, where or how Mr. Morrow was abusive to them. The statement was not proven to be spontaneous and to also not be in response to a question, and the nature of the declarant was child in trouble trying to justify his recent improper actions. His mental status was only described as "very emotional." Thus, the statement did not meet the requirements of an excited utterance and the statement was inadmissible.

Each of these three statements was inadmissible hearsay, and prejudiced Mr. Morrow's trial by tending to prove bad acts against him. Along with other hearsay below, Mr. Morrow's substantial rights were affected. Thus, Mr. Morrow is entitled to a new trial on punishment.

## 5. THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT MR. MORROW OF BURGLARY.

Under legal sufficiency, Texas Courts review all the evidence in the light most favorable to verdict to determine whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App.2010) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)); *Hartsfield v. State,* 305 S.W.3d 859, 863 (Tex.App.-Texarkana 2010, pet. ref'd). The sufficiency of the evidence is reviewed against the hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997).

To prove burglary of a habitation, the prosecution must show that Appellant entered a habitation "without the effective consent of the owner...." Tex. Penal Code Ann. § 30.02(a). An owner is one "has title to the property, possession of the property, whether lawful or not, *or a greater right to possession than the actor* ...." *Id.* § 1.07(a)(35)(A) (emphasis added). Possession is "actual care, custody, control, or management." *Id.* § 1.07(a)(39). Therefore, under the burglary statute, a person with a greater right to the actual care, custody, or control of the building than the defendant may be alleged as the "owner." *Alexander v. State,* 753 S.W.2d 390, 392 (Tex.Crim.App.1988). The question here is whether the evidence was legally sufficient to prove that Gina Morrow had a greater right to possession of the Ivanhoe residence than her husband.

The evidence presented on this point was that Gina Morrow voluntarily moved out on her husband Gary Morrow, and both of their names were on the deed. Ms. Morrow testified that she and Mr. Morrow previously agreed that she would take back the

26

property and he would move out, that he asked for an extension to his move-out deadline and then did move out. This agreement was never signed into an order by a judge, but Mr. Morrow in fact filed a motion to modify this agreement, which is evidence that some agreement existed. The evidence was that both he and Gina had property at the address. Ms. Morrow testified that she was in sole possession of the property, but was living at the property and in Collin County, Texas off and on following Mr. Morrow's exit through at least May 5, 2013. Additionally, the property was locked and there was evidence that Mr. Morrow bypassed a locked gate and entered the house through a window.

Appellant would argue that the evidence was legally insufficient to convict him of burglary of his own habitation, as he was a joint record owner and community property owner of the property. In *Mack v. State*, 928 S.W.2d 219, 223 (Tex. App. – Austin, 1996, p.d.r. ref'd), the Court stated that a joint owner who voluntarily abandons rights to a property can be held to have burglarized the same, where the leasehold owner 1) voluntarily moved out, 2) removed almost all of his possessions, 3) began living with his parents, 4) stopped paying bills, 5) was repaid for his portion of the deposit, and 6) agreed not to visit unless he first called.

Counsel would distinguish *Mack* in that Mr. Morrow was a community property owner and record owner of the house in question. A judicial order was required to remove his legal possessory interest in the property at question, and such order was never entered. Since such order was not entered, under community property Mr. Morrow had just as much right as Gina Morrow to be at the property on the night in question.

Texas Family Code section 3.102 states:

(a)  During marriage, each spouse has the sole management, control, and disposition of the community property that the spouse would have owned if single, including: (1)  personal earnings; (2)  revenue from separate property; (3) recoveries for personal injuries;  and (4)  the increase and mutations of, and the revenue from, all property subject to the spouse's sole management, control, and disposition.

(b)  If community property subject to the sole management, control, and disposition of one spouse is mixed or combined with community property subject to the sole management, control, and disposition of the other spouse, then the mixed or combined community property is subject to the joint management, control, and disposition of the spouses, unless the spouses provide otherwise by power of attorney in writing or other agreement.

(c)  Except as provided by Subsection (a), *community property is subject to the joint management, control, and disposition of the spouses unless the spouses provide otherwise by power of attorney in writing or other agreement.*

(emphasis added).  Community property held in the names of both spouses is considered joint management community property.  *City of Emory v. Lusk*, 278 S.W.3d 77(Tex. App. – Tyler 2009, no pet.).   Thus, Ms. Morrow must prove an agreement between the party that comports with 3.102(c)'s requirements to prove a "greater right of possession."

This appears to be a case of first impression for the Court on the community management issue.

## CONCLUSION & PRAYER

Wherefore, premises considered, Mr. Morrow prays that this Court, after reviewing the record and the arguments of parties, reverse the conviction and sentence in this case, and remand for a new trial.

RESPECTFULLY SUBMITTED,

/s/ *Micah Belden*_____
Micah Belden
State Bar No. 24044294
711 N. Travis
Sherman, TX 75090
P.: 903-744-4252
F.: 903-893-1734

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served upon the Fannin County District Attorney's Office, Mr. Richard Glaser, on October 20, 2015 by email.

*/s/ Micah Belden*_____
Micah Belden

## CERTIFICATE OF COMPLIANCE

This is to certify that this document contains 8,512 words, exclusive of those excluded by the Texas Rules of Appellate Procedure.

/s/ *Micah Belden*
